PARRATT ET AL. *v.* TAYLOR

No. 79-1734.  Argued March 2, 1981—Decided May 18, 1981

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, and STEVENS, JJ.,

joined. STEWART, J., *post*, p. 544, WHITE, J., *post*, p. 545, and BLACK-MUN, J., *post*, p. 545, filed concurring opinions. POWELL, J., filed an opinion concurring in the result, *post*, p. 546. MARSHALL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 554.

*J. Kirk Brown,* Assistant Attorney General of Nebraska, argued the cause for petitioners. With him on the brief was *Paul L. Douglas,* Attorney General.

*Kevin Colleran,* by appointment of the Court, 449 U. S. 980, argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Arizona et al. by *Robert K. Corbin,* Attorney General of Arizona, *J. D. McFarlane,* Attorney General of Colorado, *Carl R. Ajello,* Attorney General of Connecticut, *David H. Leroy,* Attorney General of Idaho, *Tyrone C. Fahner,* Attorney General of Illinois, *Theodore L. Sendak,* Attorney General of Indiana, *Thomas J. Miller,* Attorney General of Iowa, *Robert T. Stephan,* Attorney General of Kansas, *Frank J. Kelley,* Attorney General of Michigan, *Warren R. Spannaus,* Attorney General of Minnesota, *William A. Allain,* Attorney General of Mississippi, *John Ashcroft,* Attorney General of Missouri, and *Paul Robert Otto* and *John M. Morris,* Assistant Attorneys General, *Gregory H. Smith,* Acting Attorney General of New Hampshire, *Robert Abrams,* Attorney General of New York, *Rufus L. Edmisten,* Attorney General of North Carolina, *Allen I. Olson,* Attorney General of North Dakota, *William J. Brown,* Attorney General of Ohio, *James M. Brown,* Attorney General of Oregon, *Harvey Bartle III,* Attorney General of Pennsylvania, *Daniel R. McLeod,* Attorney General of South Carolina, *Mark V. Mierhenry,* Attorney General of South Dakota, *William M. Leech, Jr.,* Attorney General of Tennessee, *Robert B. Hansen,* Attorney General of Utah, *Chancey H. Browning,* Attorney General of West Virginia, and *John D. Troughton,* Attorney General of Wyoming; for the State of Hawaii by *Wayne Minami,* Attorney General, and *James H. Dannenberg,* Deputy Attorney General; for Americans for Effective Law Enforcement, Inc., et al. by *Fred E. Inbau, Wayne W. Schmidt, Frank G. Carrington, Jr., James P. Manak,* and *Theodore L. Sendak,* Attorney General of Indiana; for the Commonwealth of Massachusetts by *Francis X. Bellotti,* Attorney General, and *Roberta Thomas Brown,* Assistant Attorney General; for the State of Texas by *Mark White,* Attorney General, *John W. Fainter, Jr.,* First Assistant Attorney General, *Richard E. Gray III,* Executive Assistant Attorney General, and *Barbara C. Marquardt,* Assistant Attorney General; and for the State of New Jersey by

JUSTICE REHNQUIST delivered the opinion of the Court.

The respondent is an inmate at the Nebraska Penal and Correctional Complex who ordered by mail certain hobby materials valued at $23.50. The hobby materials were lost and respondent brought suit under 42 U. S. C. § 1983 to recover their value. At first blush one might well inquire why respondent brought an action in federal court to recover damages of such a small amount for negligent loss of property, but because 28 U. S. C. § 1343, the predicate for the jurisdiction of the United States District Court, contains no minimum dollar limitation, he was authorized by Congress to bring his action under that section if he met its requirements and if he stated a claim for relief under 42 U. S. C. § 1983. Respondent claimed that his property was negligently lost by prison officials in violation of his rights under the Fourteenth Amendment to the United States Constitution. More specifically, he claimed that he had been deprived of property without due process of law.[1]

The United States District Court for the District of Nebraska entered summary judgment for respondent, and the United States Court of Appeals for the Eighth Circuit af-

*John J. Degnan,* Attorney General, *Stephen Skillman,* Assistant Attorney General, and *Joseph T. Maloney* and *George W. Fisher, Jr.,* Deputy Attorneys General.

*Gary H. Palm* filed a brief for the Edwin F. Mandel Legal Aid Clinic as *amicus curiae* urging affirmance.

*Bruce J. Ennis, Jr.,* filed a brief for the American Civil Liberties Union as *amicus curiae.*

[1] As we explained in *Board of Regents* v. *Roth,* 408 U. S. 564 (1972), property interests "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.,* at 577. It is not contended that under Nebraska law respondent does not enjoy a property interest in the hobby materials here in question.

firmed in a *per curiam* order. 620 F. 2d 307 (1980). We granted certiorari. 449 U. S. 917 (1980).

I

The facts underlying this dispute are not seriously contested. Respondent paid for the hobby materials he ordered with two drafts drawn on his inmate account by prison officials. The packages arrived at the complex and were signed for by two employees who worked in the prison hobby center. One of the employees was a civilian and the other was an inmate. Respondent was in segregation at the time and was not permitted to have the hobby materials. Normal prison procedures for the handling of mail packages is that upon arrival they are either delivered to the prisoner who signs a receipt for the package or the prisoner is notified to pick up the package and to sign a receipt. No inmate other than the one to whom the package is addressed is supposed to sign for a package. After being released from segregation, respondent contacted several prison officials regarding the whereabouts of his packages. The officials were never able to locate the packages or to determine what caused their disappearance.

In 1976, respondent commenced this action against the petitioners, the Warden and Hobby Manager of the prison, in the District Court seeking to recover the value of the hobby materials which he claimed had been lost as a result of the petitioners' negligence. Respondent alleged that petitioners' conduct deprived him of property without due process of law in violation of the Fourteenth Amendment of the United States Constitution. Respondent chose to proceed in the United States District Court under 28 U. S. C. § 1343 and 42 U. S. C. § 1983, even though the State of Nebraska had a tort claims procedure which provided a remedy to persons who suffered tortious losses at the hands of the State.

On October 25, 1978, the District Court granted respond-

ent's motion for summary judgment. The District Court ruled that negligent actions by state officials can be a basis for an action under 42 U. S. C. § 1983; petitioners were not immune from damages actions of this kind; and the deprivation of the hobby kit "implicate[d] due process rights." The District Court explained:

> "This is not a situation where prison officials confiscated contraband. The negligence of the officials in failing to follow their own policies concerning the distribution of mail resulted in a loss of personal property for [respondent], which loss should not go without redress." App. to Pet. for Cert. 9.

## II

In the best of all possible worlds, the District Court's above-quoted statement that respondent's loss should not go without redress would be an admirable provision to be contained in a code which governed the administration of justice in a civil-law jurisdiction. For better or for worse, however, our traditions arise from the common law of case-by-case reasoning and the establishment of precedent. In 49 of the 50 States the common-law system, as modified by statute, constitutional amendment, or judicial decision governs. Coexisting with the 50 States which make it up, and supreme over them to the extent of its authority under Art. IV of the Constitution, is the National Government. At an early period in the history of this Nation, it was held that there was no federal common law of crimes, *United States* v. *Hudson & Goodwin,* 7 Cranch 32 (1812), and since *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), there has been no general common law applicable in federal courts merely by reason of diversity-of-citizenship jurisdiction. Therefore, in order properly to decide this case we must deal not simply with a single, general principle, however just that principle may be in the abstract, but with the complex interplay of the Consti-

tution, statutes, and the facts which form the basis for this litigation.

Because federal courts are courts of limited jurisdiction, we must first look to the Act of Congress which confers jurisdiction over claims such as respondent's on a United States district court. Such enactment is found in 28 U. S. C. § 1343, which provides in pertinent part:

> "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
>
> .          .          .          .          .
>
> "(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

The statute conferring jurisdiction is in turn closely related to 42 U. S. C. § 1983, under which respondent brought this action. Section 1983 provided in the year in question:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

While we have twice granted certiorari in cases to decide whether mere negligence will support a claim for relief under § 1983, see *Procunier* v. *Navarette,* 434 U. S. 555 (1978), and *Baker* v. *McCollan,* 443 U. S. 137 (1979), we have in each of those cases found it unnecessary to decide the issue. In *Procunier, supra,* we held that regardless of whether the

§ 1983 complaint framed in terms of negligence stated a claim for relief, the defendants would clearly have been entitled to qualified immunity and therefore not liable for damages. In *Baker, supra,* we held that no deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States had occurred, and therefore it was unnecessary to decide whether mere negligence on the part of the actor would have rendered him liable had there been such a deprivation. These two decisions, however, have not aided the various Courts of Appeals and District Courts in their struggle to determine the correct manner in which to analyze claims such as the present one which allege facts that are commonly thought to state a claim for a common-law tort normally dealt with by state courts, but instead are couched in terms of a constitutional deprivation and relief is sought under § 1983. The diversity in approaches is legion. See, *e. g., Williams* v. *Kelley,* 624 F. 2d 695 (CA5 1980); *Beard* v. *Mitchell,* 604 F. 2d 485 (CA7 1979); *Fulton Market Cold Storage Co.* v. *Cullerton,* 582 F. 2d 1071 (CA7 1978); *O'Grady* v. *Montpelier,* 573 F. 2d 747 (CA2 1978); *Bonner* v. *Coughlin,* 517 F. 2d 1311 (CA7 1975), modified[1] en banc, 545 F. 2d 565 (1976); *Hampton* v. *Holmesburg Prison Officials,* 546 F. 2d 1077 (CA3 1976); *Jones* v. *Marshall,* 528 F. 2d 132 (CA2 1975); *Diamond* v. *Thompson,* 523 F. 2d 1201 (CA5 1975); *Kimbrough* v. *O'Neil,* 523 F. 2d 1057 (CA7 1975); *Carter* v. *Estelle,* 519 F. 2d 1136 (CA5 1975); *Pitts* v. *Griffin,* 518 F. 2d 72 (CA8 1975); *Russell* v. *Bodner,* 489 F. 2d 280 (CA3 1973); *Johnson* v. *Glick,* 481 F. 2d 1028 (CA2 1973); *McCray* v. *Maryland,* 456 F. 2d 1 (CA4 1972); *Carter* v. *Carlson,* 144 U. S. App. D. C. 388, 447 F. 2d 358 (1971); *Madison* v. *Manter,* 441 F. 2d 537 (CA1 1971); *Howard* v. *Swenson,* 426 F. 2d 277 (CA8 1970); *Whirl* v. *Kern,* 407 F. 2d 781 (CA5 1968); and *Striker* v. *Pancher,* 317 F. 2d 780 (CA6 1963). We, therefore, once more put our shoulder to the wheel hoping to be of greater assistance to

courts confronting such a fact situation than it appears we have been in the past.

Nothing in the language of § 1983 or its legislative history limits the statute solely to intentional deprivations of constitutional rights. In *Baker* v. *McCollan, supra,* we sugguested that simply because a wrong was negligently as opposed to intentionally committed did not foreclose the possibility that such action could be brought under § 1983. We explained:

> "[T]he question whether an allegation of simple negligence is sufficient to state a cause of action under § 1983 is more elusive than it appears at first blush. It may well not be susceptible of a uniform answer across the entire spectrum of conceivable constitutional violations which might be the subject of a § 1983 action." 443 U. S., at 139–140.

Section 1983, unlike its criminal counterpart, 18 U. S. C. § 242, has never been found by this Court to contain a state-of-mind requirement.[2] The Court recognized as much in *Monroe* v. *Pape,* 365 U. S. 167 (1961), when we explained after extensively reviewing the legislative history of § 1983, that

> "[i]t is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges and immunities guaranteed by the Fourteenth

---

[2] Title 18 U. S. C. § 242 provides in pertinent part:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, *willfully* subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life." (Emphasis supplied.)

Amendment might be denied by the state agencies."
*Id.,* at 180.

In distinguishing the criminal counterpart which had earlier been at issue in *Screws* v. *United States,* 325 U. S. 91 (1945), the *Monroe* Court stated:

> "In the *Screws* case we dealt with a statute that imposed criminal penalities for acts 'willfully' done. We construed that word in its setting to mean the doing of an act with 'a specific intent to deprive a person of a federal right.' 325 U. S., at 103. We do not think that gloss should be put on [§ 1983] which we have here. The word 'willfully' does not appear in [§ 1983]. Moreover, [§ 1983] provides a civil remedy, while in the *Screws* case we dealt with a criminal law challenged on the grounds of vagueness. [Section 1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." 365 U. S., at 187.

Both *Baker* v. *McCollan* and *Monroe* v. *Pape* suggest that § 1983 affords a "civil remedy" for deprivations of federally protected rights caused by persons acting under color of state law without any express requirement of a particular state of mind. Accordingly, in any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

## III

Since this Court's decision in *Monroe* v. *Pape, supra,* it can no longer be questioned that the alleged conduct by the petitioners in this case satisfies the "under color of state law" requirement. Petitioners were, after all, state employees in

positions of considerable authority. They do not seriously contend otherwise. Our inquiry, therefore, must turn to the second requirement—whether respondent has been deprived of any right, privilege, or immunity secured by the Constitution or laws of the United States.

The only deprivation respondent alleges in his complaint is that "his rights under the Fourteenth Amendment of the Constitution of the United States were violated. That he was deprived of his property and Due Process of Law." App. 8. As such, respondent's claims differ from the claims which were before us in *Monroe* v. *Pape, supra,* which involved violations of the Fourth Amendment, and the claims presented in *Estelle* v. *Gamble,* 429 U. S. 97 (1976), which involved alleged violations of the Eighth Amendment. Both of these Amendments have been held applicable to the States by virtue of the adoption of the Fourteenth Amendment. See *Mapp* v. *Ohio,* 367 U. S. 643 (1961); *Robinson* v. *California,* 370 U. S. 660 (1962). Respondent here refers to no other right, privilege, or immunity secured by the Constitution or federal laws other than the Due Process Clause of the Fourteenth Amendment *simpliciter.* The pertinent text of the Fourteenth Amendment provides:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any State deprive any person of life, liberty, or property, without due process of law;* nor deny to any person within its jurisdiction the equal protection of the laws." (Emphasis supplied.)

Unquestionably, respondent's claim satisfies three prerequisites of a valid due process claim: the petitioners acted under color of state law; the hobby kit falls within the definition of property; and the alleged loss, even though negli-

gently caused, amounted to a deprivation.[3] Standing alone, however, these three elements do not establish a violation of the Fourteenth Amendment. Nothing in that Amendment protects against all deprivations of life, liberty, or property by the State. The Fourteenth Amendment protects only against deprivations "without due process of law." *Baker v. McCollan*, 443 U. S., at 145. Our inquiry therefore must focus on whether the respondent has suffered a deprivation of property without due process of law. In particular, we must decide whether the tort remedies which the State of Nebraska provides as a means of redress for property deprivations satisfy the requirements of procedural due process.

This Court has never directly addressed the question of what process is due a person when an employee of a State negligently takes his property. In some cases this Court has held that due process requires a predeprivation hearing before the State interferes with any liberty or property interest enjoyed by its citizens. In most of these cases, however, the deprivation of property was pursuant to some established state procedure and "process" could be offered before any actual deprivation took place. For example, in *Mullane* v.

---

[3] Petitioners argue that even if a negligent deprivation of respondent's property occurred, there is no evidence in the record of negligence on their part. There is merit to petitioners' arguments. Petitioners were not personally involved in the handling of the packages and respondent's basic allegation appears to be that subordinates of petitioners violated established procedures which, if properly followed, would have ensured the proper delivery of respondent's packages. In the past, this Court has refused to accept § 1983 actions premised on theories of *respondeat superior*. *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978); *Rizzo* v. *Goode*, 423 U. S. 362 (1976). On the other hand, there is no indication in the record that the petitioners ever raised in the District Court the argument that the loss of property was not caused by their negligence. Certainly, the District Court did not consider this an open question. In such a context, and with little or no factual development at the trial level, we can only accept for purposes of this opinion the District Court's assumption that petitioners were negligent and that this negligence contributed to respondent's loss.

538

*Central Hanover Trust Co.*, 339 U. S. 306 (1950), the Court struck down on due process grounds a New York statute that allowed a trust company, when it sought a judicial settlement of its trust accounts, to give notice by publication to all beneficiaries even if the whereabouts of the beneficiaries were known. The Court held that personal notice in such situations was required and stated that "when notice is a person's due, process which is a mere gesture is not due process." *Id.*, at 315. More recently, in *Bell* v. *Burson*, 402 U. S. 535 (1971), we reviewed a state statute which provided for the taking of the driver's license and registration of an uninsured motorist who had been involved in an accident. We recognized that a driver's license is often involved in the livelihood of a person and as such could not be summarily taken without a prior hearing. In *Fuentes* v. *Shevin*, 407 U. S. 67 (1972), we struck down the Florida prejudgment replevin statute which allowed secured creditors to obtain writs in *ex parte* proceedings. We held that due process required a prior hearing before the State authorized its agents to seize property in a debtor's possession. See also *Boddie* v. *Connecticut*, 401 U. S. 371 (1971); *Goldberg* v. *Kelly*, 397 U. S. 254 (1970); and *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969). In all these cases, deprivations of property were authorized by an established state procedure and due process was held to require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur.

We have, however, recognized that postdeprivation remedies made available by the State can satisfy the Due Process Clause. In such cases, the normal predeprivation notice and opportunity to be heard is pretermitted if the State provides a postdeprivation remedy. In *North American Cold Storage Co.* v. *Chicago*, 211 U. S. 306 (1908), we upheld the right of a State to seize and destroy unwholesome food without a preseizure hearing. The possibility of erroneous destruction of property was outweighed by the fact that the public health

emergency justified immediate action and the owner of the property could recover his damages in an action at law after the incident. In *Ewing* v. *Mytinger & Casselberry, Inc.*, 339 U. S. 594 (1950), we upheld under the Fifth Amendment Due Process Clause the summary seizure and destruction of drugs without a preseizure hearing. Similarly, in *Fahey* v. *Mallonee*, 332 U. S. 245 (1947), we recognized that the protection of the public interest against economic harm can justify the immediate seizure of property without a prior hearing when substantial questions are raised about the competence of a bank's management. In *Bowles* v. *Willingham*, 321 U. S. 503 (1944), we upheld in the face of a due process challenge the authority of the Administrator of the Office of Price Administration to issue rent control orders without providing a hearing to landlords before the order or regulation fixing rents became effective. See also *Corn Exchange Bank* v. *Coler*, 280 U. S. 218 (1930); *McKay* v. *McInnes*, 279 U. S. 820 (1929); *Coffin Brothers & Co.* v. *Bennett*, 277 U. S. 29 (1928); and *Ownbey* v. *Morgan*, 256 U. S. 94 (1921). These cases recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process.[4] As we stated in *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600 (1974):

> "Petitioner asserts that his right to a hearing before his possession is in any way disturbed is nonetheless

---

[4] In *Arnett* v. *Kennedy*, 416 U. S. 134 (1974), JUSTICE WHITE noted the importance of a meaningful postdeprivation hearing when referring to many of the above cases:

"While these cases indicate that the particular interests involved might not have demanded a hearing immediately, they also reaffirm the principle that property may not be taken without a hearing at some time." *Id.*, at 179 (concurring in part and dissenting in part).

mandated by a long line of cases in this Court, culminating in *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969), and *Fuentes* v. *Shevin*, 407 U. S. 67 (1972). The pre-*Sniadach* cases are said by petitioner to hold that 'the opportunity to be heard must precede any actual deprivation of private property.' Their import, however, is not so clear as petitioner would have it: they merely stand for the proposition that a hearing must be had before one is finally deprived of his property and do not deal at all with the need for a pretermination hearing where a full and immediate post-termination hearing is provided. The usual rule has been '[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.' *Phillips* v. *Commissioner*, 283 U. S. 589, 596–597 (1931)." *Id.*, at 611 (footnote omitted).

Our past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property interests. The fundamental requirement of due process is the opportunity to be heard and it is an "opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo*, 380 U. S. 545, 552 (1965). However, as many of the above cases recognize, we have rejected the proposition that "at a meaningful time and in a meaningful manner" *always* requires the State to provide a hearing prior to the initial deprivation of property.[5] This rejection is based in part on the impractica-

---

[5] As we explained in *Mathews* v. *Eldridge*, 424 U. S. 319 (1976):

"In recent years this Court increasingly has had occasion to consider the extent to which due process requires an evidentiary hearing prior to the deprivation of some type of property interest even if such a hearing is provided thereafter. In only one case, *Goldberg* v. *Kelly*, 397 U. S., at 266–271, has the Court held that a hearing closely approximating a judicial trial is necessary. In other cases requiring some type of pre-

bility in some cases of providing any preseizure hearing under a state-authorized procedure, and the assumption that at some time a full and meaningful hearing will be available.

The justifications which we have found sufficient to uphold takings of property without any predeprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under "color of law," is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation. That does not mean, of course, that the State can take property without providing a meaningful postdeprivation hearing. The prior cases which have excused the prior-hearing requirement have rested in part on the availability of some meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities.

A case remarkably similar to the present one is *Bonner* v. *Coughlin,* 517 F. 2d 1311 (CA7 1975), modified en banc, 545 F. 2d 565 (1976), cert. denied, 435 U. S. 932 (1978). There, a prisoner alleged that prison officials "made it possible by leaving the door of Plaintiff's cell open, for others without authority to remove Plaintiff's trial transcript from the cell." 517 F. 2d, at 1318. The question presented was whether negligence may support a recovery under § 1983. Then Judge Stevens, writing for a panel of the Court of Appeals for the Seventh Circuit, recognized that the question that had to be

termination hearing as a matter of constitutional right the Court has spoken sparingly about the requisite procedures." *Id.,* at 333.

decided was "whether it can be said that the deprivation was 'without due process of law.' " *Ibid.* He concluded:

> "It seems to us that there is an important difference between a challenge to an established state procedure ⌄as lacking in due process and a property damage claim arising out of the misconduct of state officers. In the former situation the facts satisfy the most literal reading of .the Fourteenth Amendment's prohibition against 'State' deprivations of property; in the latter situation, however, even though there is action 'under color of' state law sufficient to bring the amendment into play, the state action is not necessarily complete. For in a case such as this the law of Illinois provides, in substance, that the plaintiff is entitled to be made whole for any loss of property occasioned by the unauthorized conduct of the prison guards. We may reasonably conclude, therefore, that the existence of an adequate state remedy to redress property damage inflicted by state officers avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment." *Id.,* at 1319.

We believe that the analysis recited above in *Bonner* is the proper manner in which to approach a case such as this. This analysis is also quite consistent with the approach taken by this Court in *Ingraham* v. *Wright,* 430 U. S. 651 (1977), where the Court was confronted with the claim that corporal punishment in public schools violated due process. Arguably, the facts presented to the Court in *Ingraham* were more egregious than those presented here inasmuch as the Court was faced with both an intentional act (as opposed to negligent conduct) and a deprivation of liberty. However, we reasoned:

> " 'At some point the benefit of an additional safeguard to the individual affected . . . and to society in terms of

increased assurance that the action is just, may be outweighed by the cost.' *Mathews* v. *Eldridge,* 424 U. S., at 348. We think that point has been reached in this case. In view of the low incidence of abuse, the openness of our schools, *and the common-law safeguards that already exist,* the risk of error that may result in violation of a schoolchild's substantive rights can only be regarded as minimal. Imposing additional administrative safeguards as a constitutional requirement might reduce that risk marginally, but would also entail a significant intrusion into an area of primary educational responsibility." *Id.,* at 682. (Emphasis supplied.)

## IV

Application of the principles recited above to this case leads us to conclude the respondent has not alleged a violation of the Due Process Clause of the Fourteenth Amendment. Although he has been deprived of property under color of state law, the deprivation did not occur as a result of some established state procedure. Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure. There is no contention that the procedures themselves are inadequate nor is there any contention that it was practicable for the State to provide a predeprivation hearing. Moreover, the State of Nebraska has provided respondent with the means by which he can receive redress for the deprivation. The State provides a remedy to persons who believe they have suffered a tortious loss at the hands of the State. See Neb. Rev. Stat. § 81–8,209 *et seq.* (1976). Through this tort claims procedure the State hears and pays claims of prisoners housed in its penal institutions. This procedure was in existence at the time of the loss here in question but respondent did not use it. It is argued that the State does not adequately protect the respondent's interests because it provides only for an action against the State as opposed to its individual employees,

it contains no provisions for punitive damages, and there is no right to a trial by jury. Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process. The remedies provided could have fully compensated the respondent for the property loss he suffered, and we hold that they are sufficient to satisfy the requirements of due process.

Our decision today is fully consistent with our prior cases. To accept respondent's argument that the conduct of the state officials in this case constituted a violation of the Fourteenth Amendment would almost necessarily result in turning every alleged injury which may have been inflicted by a state official acting under "color of law" into a violation of the Fourteenth Amendment cognizable under § 1983. It is hard to perceive any logical stopping place to such a line of reasoning. Presumably, under this rationale any party who is involved in nothing more than an automobile accident with a state official could allege a constitutional violation under § 1983. Such reasoning "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul* v. *Davis*, 424 U. S. 693, 701 (1976). We do not think that the drafters of the Fourteenth Amendment intended the Amendment to play such a role in our society.

Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE STEWART, concurring.

It seems to me extremely doubtful that the property loss here, even though presumably caused by the negligence of state agents, is the kind of deprivation of property to which the Fourteenth Amendment is addressed. If it is, then so too would be damages to a person's automobile resulting from

a collision with a vehicle negligently operated by a state official. To hold that this kind of loss is a deprivation of property within the meaning of the Fourteenth Amendment seems not only to trivialize, but grossly to distort the meaning and intent of the Constitution.

But even if Nebraska has deprived the respondent of his property in the constitutional sense, it has not deprived him of it without due process of law. By making available to the respondent a reparations remedy, Nebraska has done all that the Fourteenth Amendment requires in this context.

On this understanding, I join the opinion of the Court.

JUSTICE WHITE, concurring.

I join the opinion of the Court but with the reservations stated by my Brother BLACKMUN in his concurring opinion.

JUSTICE BLACKMUN, concurring.

While I join the Court's opinion in this case, I write separately to emphasize my understanding of its narrow reach. This suit concerns the deprivation only of property and was brought only against supervisory personnel, whose simple "negligence" was assumed but, on this record, not actually proved. I do not read the Court's opinion as applicable to a case concerning deprivation of life or of liberty. Cf. *Moore* v. *East Cleveland,* 431 U. S. 494 (1977). I also do not understand the Court to intimate that the sole content of the Due Process Clause is procedural regularity. I continue to believe that there are certain governmental actions that, even if undertaken with a full panoply of procedural protection, are, in and of themselves, antithetical to fundamental notions of due process. See, *e. g., Boddie* v. *Connecticut,* 401 U. S. 371 (1971); *Roe* v. *Wade,* 410 U. S. 113 (1973).

Most importantly, I do not understand the Court to suggest that the provision of "postdeprivation remedies," *ante,* at 538, within a state system would cure the unconstitutional

nature of a state official's intentional act that deprives a person of property. While the "random and unauthorized" nature of negligent acts by state employees makes it difficult for the State to "provide a meaningful hearing before the deprivation takes place," *ante,* at 541, it is rare that the same can be said of intentional acts by state employees. When it is possible for a State to institute procedures to contain and direct the intentional actions of its officials, it should be required, as a matter of due process, to do so. See *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337 (1969); *Fuentes* v. *Shevin,* 407 U. S. 67 (1972); *Goldberg* v. *Kelly,* 397 U. S. 254 (1970). In the majority of such cases, the failure to provide adequate process prior to inflicting the harm would violate the Due Process Clause. The mere availability of a subsequent tort remedy before tribunals of the same authority that, through its employees, deliberately inflicted the harm complained of, might well not provide the due process of which the Fourteenth Amendment speaks.

JUSTICE POWELL, concurring in the result.

This case presents the question whether a state prisoner may sue to recover damages under 42 U. S. C. § 1983, alleging that a violation of the Due Process Clause of the Fourteenth Amendment occurred when two shipments mailed to him were lost due to the negligence of the prison's warden and "hobby manager." Unlike the Court, I do not believe that such negligent acts by state officials constitute a deprivation of property within the meaning of the Fourteenth Amendment, regardless of whatever subsequent procedure a State may or may not provide. I therefore concur only in the result.

The Court's approach begins with three "unquestionable" facts concerning respondent's due process claim: "the petitioners acted under color of state law; the hobby kit falls within the definition of property; and the alleged loss, even though negligently caused, amounted to a deprivation."

*Ante,* at 536–537. It then goes on to reject respondent's claim on the theory that procedural due process is satisfied in such a case where a State provides a "postdeprivation" procedure for seeking redress—here a tort claims procedure. I would not decide this case on that ground for two reasons. First, the Court passes over a threshold question—whether a negligent act by a state official that results in loss of or damage to property constitutes a deprivation of property for due process purposes.[1] Second, in doing so, the Court suggests a narrow, wholly procedural view of the limitation imposed on the States by the Due Process Clause.

The central question in this case is whether *unintentional* but negligent acts by state officials, causing respondent's loss of property, are actionable under the Due Process Clause. In my view, this question requires the Court to determine whether intent is an essential element of a due process claim, just as we have done in cases applying the Equal Protection Clause [2] and the Eighth Amendment's prohibition of "cruel and unusual punishment." [3] The intent question cannot be

---

[1] Assuming that there was a "deprivation" of the hobby kit under color of state law in this case, I would agree with the Court's conclusion that state tort remedies provide adequate procedural protection. Cf. *Ingraham* v. *Wright,* 430 U. S. 651, 674–682 (1977) (common-law remedies are adequate to afford procedural due process in cases of corporal punishment of students).

[2] *Washington* v. *Davis,* 426 U. S. 229 (1976); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252 (1977) (invidious discriminatory purpose required for claim of racial discrimination under the Equal Protection Clause).

[3] In *Estelle* v. *Gamble,* 429 U. S. 97, 105 (1976), we held that "deliberate indifference to a prisoner's serious illness or injury" on the part of prison officials is sufficient to constitute an "infliction" of cruel and unusual punishment under the Eighth Amendment. We also stated that an "accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Ibid.* *Estelle* v. *Gamble* thus supports my view of the Due Process Clause— which requires consideration not only of the *effect* of an injury or loss on

given "a uniform answer across the entire spectrum of conceivable constitutional violations which might be the subject of a § 1983 action," *Baker* v. *McCollan,* 443 U. S. 137, 139–140 (1979). Rather, we must give close attention to the nature of the particular constitutional violation asserted, in determining whether intent is a necessary element of such a violation.

In the due process area, the question is whether intent is required before there can be a "deprivation" of life, liberty, or property. In this case, for example, the negligence of the prison ·officials caused respondent to lose his property. Nevertheless, I would not hold that such a negligent act, causing unintended loss of or injury to property, works a deprivation in the *constitutional sense.* Thus, no procedure for compensation is constitutionally required.

A "deprivation" connotes an intentional act denying something to someone, or, at the very least, a deliberate decision not to act to prevent a loss.[4] The most reasonable interpretation of the Fourteenth Amendment would limit due process claims to such active deprivations.[5] This is the view

a citizen but also of the *intent* of the state official whose actions caused the injury or loss.

[4] According to Webster's New International Dictionary of the English Language (2d ed. 1945), to "deprive" is to "dispossess; bereave; divest; to hinder from possessing; debar; shut out."

[5] In analogous contexts, we have held that the intent of state officials is a relevant factor to consider in determining whether an individual has suffered a denial of due process. In *United States* v. *Lovasco,* 431 U. S. 783, 790 (1977), involving preindictment prosecutorial delay, we held that "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused."

Similarly, in *Baker* v. *McCollan,* 443 U. S. 137 (1979), the Court reviewed a claimed violation of due process occurring when a sheriff arrested the individual named in an arrest warrant and failed for a time to realize that the warrant itself had named the wrong person. The Court there noted that "the state of mind of the defendant may be relevant on

adopted by an overwhelming number of lower courts, which have rejected due process claims premised on negligent acts without inquiring into the existence or sufficiency of the subsequent procedures provided by the States.[6]   In addition, such a rule would avoid trivializing the right of action provided in § 1983.   That provision was enacted to deter real *abuses* by state officials in the exercise of governmental powers.   It would make no sense to open the federal courts to lawsuits where there has been no affirmative abuse of power, merely a negligent deed by one who happens to be acting under color of state law.   See n. 12, *infra.*[7]

---

the issue of whether a constitutional violation has occurred in the first place," *id.,* at 140, n. 1, and went on to hold that there had been no deprivation of liberty without due process of law.   The Court reasoned that there is no duty to investigate "every claim of innocence," *id.,* at 146, and no constitutional requirement of an "error-free investigation of such a claim," *ibid.*   It relied on the fact that the sheriff had acted reasonably in relying on a facially valid arrest warrant, thus implicitly distinguishing a case involving an *intentional* deprivation of liberty without cause.

To be sure, even where there has been an intentional deprivation of property, due process claims also must satisfy the requirement that the act be sufficiently linked to an official's state-created duties or powers to constitute "state action."   See n. 10, *infra.*

[6] See, *e. g., Williams* v. *Kelley,* 624 F. 2d 695 (CA5 1980), cert. pending, No. 80–6165; *Bonner* v. *Coughlin,* 545 F. 2d 565 (CA7 1976) (en banc), cert. denied, 435 U. S. 932 (1978); *Harper* v. *Cserr,* 544 F. 2d 1121, 1124 (CA1 1976); *Williams* v. *Vincent,* 508 F. 2d 541, 546 (CA2 1974); *Jenkins* v. *Averett,* 424 F. 2d 1228, 1232 (CA4 1970); *Kent* v. *Prasse,* 385 F. 2d 406 (CA3 1967) *(per curiam).*   See also *Paul* v. *Davis,* 424 U. S. 693, 698 (1976) (suggesting that there should not be a § 1983 action in favor of "the survivors of an innocent bystander mistakenly shot by a policeman or negligently killed by a sheriff driving a government vehicle").

There is no occasion here to express any view as to the possibility of negligent violations of other, more particular constitutional guarantees.

[7] We have previously expressed concerns about the prospect that the Due Process Clause may become a vehicle for federal litigation of state torts.   In *Paul* v. *Davis, supra,* we held that an official action damaging the reputation of a private citizen, although an actionable tort under state law, did not constitute a deprivation of "liberty" within the meaning of

The Court appears unconcerned about this prospect, probably because of an implicit belief in the availability of state tort remedies in most cases. In its view, such remedies will satisfy procedural due process, and relegate cases of official negligence to nonfederal forums. But the fact is that this rule would "make of the Fourteenth Amendment a font of tort law," *Paul* v. *Davis*, 424 U. S. 693, 701 (1976), whenever a State has failed to provide a remedy for negligent invasions of liberty or property interests.[8] Moreover, despite

the Fourteenth Amendment. In so holding we relied principally on the fact that the individual's interest in his reputation was not accorded a "legal guarantee of present enjoyment" under state law, since it was "simply one of a number [of interests] which the State may protect against injury by virtue of its tort law." *Id.*, at 711–712.

Attention to the "guarantees" provided by state law is at least as appropriate in a case involving an alleged deprivation of "property." It is clear that the hobby kit was respondent's "property." But it also is clear that under state law no remedy other than tort law protects property from interferences caused by the negligence of others. The reasoning of *Paul* v. *Davis* would suggest, therefore, that the enjoyment of property free of negligent interference is not sufficiently "guaranteed" by state law to justify a due process claim based on official negligence.

A State perhaps could constitutionalize certain negligent actions by state officials by criminalizing negligence, thus extending its guarantee to this kind of interference. Instead, the States merely have created systems for civil compensation of tort victims. In this sense, state law draws a clear distinction between negligently caused injuries and intentional thefts or assaults.

[8] One additional problem with the Court's purely procedural approach is worth noting. In *Kent* v. *Prasse, supra,* the Third Circuit faced a claimed deprivation of procedural due process by prison officials based on the failure of a State to provide a tort remedy for official negligence—the exact claim validated by the Court today. The court noted that "[i]n any event, such a deprivation would be the work of the state, not these defendants." 385 F. 2d, at 407. Arguably, if the absence of a tort remedy is the heart of one's constitutional claim, the defendant in the § 1983 suit must be the State itself, or its lawmakers, both of whom are immune from suit. See *Tenney* v. *Brandhove,* 341 U. S. 367 (1951) (legislators);

the breadth of state tort remedies, such claims will be more numerous than might at first be supposed. In *Kent* v. *Prasse,* 385 F. 2d 406 (CA3 1967) (*per curiam*), for example, a state prisoner was forced to work on a faulty machine, sustained an injury, and brought suit against prison officials. The United States Court of Appeals for the Third Circuit noted that the State, unfortunately, did not provide compensation for this injury, but stated:

"Nor are we able to perceive that a tort committed by a state official acting under color of law is, in and of itself, sufficient to show an invasion of a person's right under [§ 1983]. While not dispositive, we note that there is no allegation that defendants violated any state criminal law or acted out of bad motive. Nor [is it] alleged that any state law was not enforced by the defendants." *Id.,* at 407.[9]

Rather than reject this reasoning, I would adopt the view that negligent official acts do not provide any basis for in-

---

*Edelman* v. *Jordan,* 415 U. S. 651, 662–663 (1974) (Eleventh Amendment bars suits against States in federal court). If so, the only remedy available to plaintiffs would be a more substantive due process claim—where grounds for such a claim exist. The Court does not discuss this possibility.

[9] Another example is presented in the case of *Hamilton* v. *Stover,* cert. pending, No. 80–1419 (filed Feb. 20, 1981), involving a collision between a police car and another car. In an unpublished order, the Sixth Circuit affirmed dismissal of a resulting § 1983 action against the policeman, reasoning that negligent driving cannot constitute a deprivation of constitutional rights. *Hamilton* v. *Stover,* No. 79–3562 (Nov. 24, 1980). In his brief in this Court, however, the policeman points out that he and the employing municipality possess absolute immunity under Ohio law, Ohio Rev. Code § 701.02 (1976), for acts while responding to an emergency call. If this immunity has the effect of cutting off all state-law remedies, under the Court's reasoning there appears to be a deprivation of procedural due process, actionable in federal court.

quiries by federal courts into the existence, or procedural adequacy, of applicable state tort remedies.

Such an approach has another advantage; it avoids a somewhat disturbing implication in the Court's opinion concerning the scope of due process guarantees. The Court analyzes this case solely in terms of the procedural rights created by the Due Process Clause. Finding state procedures adequate, it suggests that no further analysis is required of more substantive limitations on state action located in this Clause. Cf. *Paul* v. *Davis, supra,* at 712–714 (assessing the claim presented in terms of the "substantive aspects of the Fourteenth Amendment"); *Ingraham* v. *Wright,* 430 U. S. 651, 679, n. 47 (1977) (leaving open the question whether "corporal punishment of a public school child may give rise to an independent federal cause of action to vindicate substantive rights under the Due Process Clause").

The Due Process Clause imposes substantive limitations on state action, and under proper circumstances[10] these limi-

---

[10] Even intentional injuries inflicted by state officials must be "state action" to implicate the due process guarantees, and must be "under color of" state law in order to be actionable under § 1983. In this area we have drawn a distinction between mere "torts of state officials" and "acts done 'under color' of law . . . which deprived a person of some right secured by the Constitution or laws of the United States." *Screws* v. *United States,* 325 U. S. 91, 109 (1945) (plurality opinion of Douglas, J.) (discussing the criminal analogue of § 1983—now codified as 18 U. S. C. § 242). Actionable deprivations must be based on " '[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Ibid.* (quoting *United States* v. *Classic,* 313 U. S. 299, 326 (1941)). See also *Screws, supra,* at 134 (Rutledge, J., concurring in result) (the Constitution protects the "right not to be deprived of life or liberty by a state officer *who takes it by abuse of his office and its power")* (emphasis added). Where state officials cause injuries in ways that are equally available to private citizens, constitutional issues are not necessarily raised. As Justice Douglas put it in *Screws:* "The fact that a prisoner is assaulted, injured, or even murdered by state officials does not necessarily mean that

tations may extend to intentional and malicious deprivations of liberty [11] and property,[12] even where compensation is available under state law. The Court, however, fails altogether to discuss the possibility that the kind of state action alleged here constitutes a violation of the substantive guarantees of the Due Process Clause. As I do not consider a negligent act the kind of deprivation that implicates the procedural guarantees of the Due Process Clause, I certainly would not view negligent acts as violative of these substantive guarantees. But the Court concludes that there has been such a deprivation. And yet it avoids entirely the question whether the Due Process Clause may place substantive limitations on this form of governmental conduct.

In sum, it seems evident that the reasoning and decision of the Court today, even if viewed as compatible with our precedents, create new uncertainties as well as invitations to

---

he is deprived of any right protected or secured by the Constitution or laws of the United States." 325 U. S., at 108.

[11] See, e. g., Rochin v. California, 342 U. S. 165 (1952); Hall v. Tawney, 621 F. 2d 607, 613 (CA4 1980) (corporal punishment of students may have violated due process if it "amounted to a brutal and inhumane abuse of official power literally shocking to the conscience"); Bellows v. Dainack, 555 F. 2d 1105, 1106, n. 1 (CA2 1977) (use of excessive force by policeman during the course of an arrest constitutes a deprivation of "liberty" without due process).

[12] See, e. g., Kimbrough v. O'Neil, 545 F. 2d 1059, 1061 (CA7 1976) (en banc) ("a taking with intent (or reckless disregard) of a claimant's property by a State agent violates the Due Process Clause of the Fourteenth Amendment and is actionable under Section 1983"); Carter v. Estelle, 519 F. 2d 1136, 1136–1137 (CA5 1975) (per curiam) (same). See also San Diego Gas & Electric Co. v. San Diego, 450 U. S. 621, 656, n. 23 (1981) (BRENNAN, J., dissenting) (when property is taken by the government but not in furtherance of a "public use," "the government entity may not be forced to pay just compensation under the Fifth Amendment, [but] the landowner may nevertheless have a damages cause of action under 42 U. S. C. § 1983 for a Fourteenth Amendment due process violation").

litigate under a statute that already has burst its historical bounds.[13]

JUSTICE MARSHALL, concurring in part and dissenting in part.

I join the opinion of the Court insofar as it holds that negligent conduct by persons acting under color of state law

---

[13] Section 1983 was enacted in 1871 as one of the statutes intended to implement the Fourteenth Amendment. For many years it remained a little-used, little-known section of the Code. In the past two decades, however, resourceful counsel and receptive courts have extended its reach vastly. This statute with a clearly understood and commendable purpose no longer is confined to deprivations of individual rights as intended in 1871. As a result, § 1983 has become a major vehicle for general litigation in the federal courts by individuals and corporations.

Professor Christina Whitman recently has addressed this expansion of § 1983 with a comprehensive assessment of arguable pluses and minuses. See Whitman, Constitutional Torts, 79 Mich. L. Rev. 5 (1980). There will be no pluses, however, if the striking escalation of suits under § 1983 against state and local officials is augmented by suits based on negligent conduct. Professor Whitman noted, for example, that civil rights petitions by state prisoners in federal court increased from 218 cases in 1966 to 11,195 in 1979. *Id.,* at 6. See also the Annual Report of the Director of the Administrative Office of the U. S. Courts 62 (1980), reporting a further increase in this number to 12,397 in 1980. The societal costs of using this statute for a purpose never contemplated are high indeed:

"First, the existence of the statutory cause of action means that every expansion of constitutional rights [through § 1983] will increase the caseload of already overburdened federal courts. This increase dilutes the ability of federal courts to defend our most significant rights. Second, every [such] expansion . . . displaces state lawmaking authority by diverting decision-making to the federal courts." Whitman, *supra,* at 25.

The present case, involving a $23 loss, illustrates the extent to which constitutional law has been trivialized, and federal courts often have been converted into small-claims tribunals. There is little justification for making such a claim a federal case, requiring a decision by a district court, an appeal as a matter of right to a court of appeals, and potentially, consideration of a petition for certiorari in this Court. It is not in the interest of claimants or of society for disputes of this kind to be resolved by litigation that may take years, particularly in an over-

may be actionable under 42 U. S. C. § 1983. *Ante,* at 534–535. I also agree with the majority that in cases involving claims of *negligent* deprivation of property without due process of law, the availability of an adequate postdeprivation cause of action for damages under state law may preclude a finding of a violation of the Fourteenth Amendment. I part company with the majority, however, over its conclusion that there was an adequate state-law remedy available to respondent in this case. My disagreement with the majority is not because of any shortcomings in the Nebraska tort claims procedure.[1] Rather, my problem is with the majority's application of its legal analysis to the facts of this case.

It is significant, in my view, that respondent is a state prisoner whose access to information about his legal rights is necessarily limited by his confinement. Furthermore, there is no claim that either petitioners or any other officials informed respondent that he could seek redress for the alleged deprivation of his property by filing an action under the Nebraska tort claims procedure. This apparent failure takes

burdened federal system that never was designed to be utilized in this way. Congress, recognizing the problem with respect to prisoner petitions, enacted last year the Civil Rights of Institutionalized Persons Act, Pub. L. 96–247, 94 Stat. 349, authorizing federal courts to continue § 1983 prisoner cases for up to 90 days to allow recourse to administrative remedies. The grievance procedures, however, must be certified by the Attorney General or determined by the court to be in compliance with not insubstantial procedural requirements. *Id.,* § 7, 42 U. S. C. § 1997e (1976 ed., Supp. IV). As a result, the Act continues to allow resort to the federal courts in many cases of this kind. In view of increasing damages-suit litigation under § 1983, and the inability of courts to identify principles that can be applied consistently, perhaps the time has come for a revision of this century-old statute—a revision that would clarify its scope while preserving its historical function of protecting individual rights from unlawful state action.

[1] To be sure, the state remedies would not have afforded respondent all the relief that would have been available in a § 1983 action. See *ante,* at 543–544. I nonetheless agree with the majority that "they are sufficient to satisfy the requirements of due process." *Ante,* at 544.

556

on additional significance in light of the fact that respondent pursued his complaint about the missing hobby kit through the prison's grievance procedure.[2] In cases such as this, I believe prison officials have an affirmative obligation to inform a prisoner who claims that he is aggrieved by official action about the remedies available under state law. If they fail to do so, then they should not be permitted to rely on the existence of such remedies as adequate alternatives to a § 1983 action for wrongful deprivation of property. Since these prison officials do not represent that respondent was informed about his rights under state law, I cannot join in the judgment of the Court in this case.

Thus, although I agree with much of the majority's reasoning, I would affirm the judgment of the Court of Appeals.

---

[2] In fact, the prison officials did not raise the issue of the availability of a state-law remedy in either the District Court or the Court of Appeals. The issue was first presented in the petition for rehearing filed in the Court of Appeals.