Joseph A. FALZERANO, Jr., Plaintiff,

v.

COLLIER, Warden of Essex County Jail, Defendant.

Civ. No. 82–71 (§ 1983).

United States District Court, D. New Jersey.

Jan. 8, 1982.

Joseph A. Falzerano, Jr., plaintiff, pro se.

## OPINION

BIUNNO, District Judge.

Although he does not say what the basis for his confinement is, the complaint submitted by Mr. Falzerano along with an affidavit of poverty for leave to file under 28 U.S.C. § 1915, it is plain from the content that he has been convicted and sentenced to N.J. State Prison, but is for the time being retained at the Essex County Jail.

As is well known, persons sentenced to N.J. State prison are ordinarily processed to the designated facility as soon as the processing routine permits. However, in June of 1981, Governor Byrne issued an order requiring county jails to hold some State inmates temporarily due to overcrowding at the State institutions. That order was extended in September, and will expire on January 20, 1982, the day after the inaugural of a new Governor.

In a suit filed by the County of Atlantic, the Supreme Court of New Jersey, acting with great expedition, issued an opinion on January 6, 1982 upholding the validity of the order because of the state of emergency temporarily existing due to the overcrowded conditions. Arrangements have been made to house up to 500 State prisoners at the former military stockade at Ft. Dix. A new section of Trenton State Prison is scheduled to open in May, and another in the Spring of 1983. Plans to demolish old buildings there have been suspended for the time being. Arrangements have been made to provide trailers as temporary housing to the counties, and the counties of Essex, Bergen, Middlesex and Ocean have agreed to accept them, and others are being considered at State facilities. A new State prison is to be built in Camden, scheduled to open in 1985. See, *Worthington v. Fauver*, 88 N.J. 183, 440 A.2d 1128 (1982).

As Justice Pashman noted in his opinion for the court, under the new criminal code enacted in 1979, N.J.S.A. 2C:1–1, *et seq.* there has been an increase in the number and length of custodial sentences, a factor tending to overcrowding since the inflow rate is higher than the outflow or release rate, in numbers for a given time period.

It is in this context of general facts, well known in the area and subject to judicial notice under Fed.Ev. Rule 201, that the present complaint is reviewed and analyzed.

Although the affidavit of poverty is scanty and conclusionary, the court accepts it as adequate and will order the clerk to file the complaint.

The complaint itself, however, is found frivolous after careful review, and is ordered dismissed on that ground as authorized by 28 U.S.C. § 1915(d).

Mr. Falzarano advances three claims or causes of action for deprivation of federal

rights under color of state law, 42 U.S.C. § 1983. These, and the facts alleged for each, are reviewed below.

*Law Library and related matters.*

Mr. Falzarano says he came into the custody of the warden at Essex County Jail on November 17, 1981 (par. 12). He says that on 11 specified dates from December 5 to December 20, 1981, and at other times during and before that period, he was denied access to the law library. He also says that on December 7 and 8, 1981 and on other dates, he was denied notarization of papers unless the notary read and retained copies. He was also told that mailings by certified mail, return receipt requested (presumably without charge to the sender) were not provided.

The facts alleged on this count, taken in their most favorable and lenient reading, fall far short of a § 1983 claim.

■ The most recent decision of the Supreme Court of the United States dealing with legal assistance to prisoners is *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). The court there adhered to *Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) holding that the States are constitutionally obliged to protect the rights of prisoners to access to the courts by providing them with law libraries, "or alternative sources of legal knowledge," against a request to overrule that case.

*Bounds* came out of North Carolina. At the trial level, it appears that there was but one prison library in the State, that it was "severely inadequate", and that there was no other legal assistance available to inmates.

After a summary judgment against the State, North Carolina proposed to establish 7 libraries with law books meeting minimum standards set by the American Correctional Institution, the American Bar Association and the American Association of Law Libraries, see 430 U.S. at 819, footnote 4, 97 S.Ct. at 1493, footnote 4.

Both sides sought review. The State sought to overrule *Younger v. Gilmore, supra,* while the prisoners sought a ruling obliging North Carolina to provide both law libraries and professional legal assistance.

Justice Marshall, for the Court, rejected both challenges. He observed that the constitutional aspect requires the provision of adequate law libraries or adequate assistance from persons trained in the law. See 430 U.S. at 828, and footnote 17, 97 S.Ct. at 1498, footnote 17. The opinion also made clear that in performing this obligation, the States were free to choose one method or the other, or a combination of both, or some other plan or system; no hard and fast rule was laid down. See 430 U.S. at 830–831, and footnotes 20 and 21, 97 S.Ct. at 1499–1500, and footnotes 20 and 21.

In this regard, New Jersey has been a national leader. As far back as 1964, with the approval of the Supreme Court under Chief Justice Weintraub, an experimental plan was established in Essex County (the busiest in the State). This plan was conducted for some 3 years, under the able guidance of Thomas Argyris, Esq., an experienced lawyer and municipal court judge loaned to the project from the legal staff of a large corporate employer, and then by June Strelecki, Esq. (now a Judge of the Superior Court), who had been first assistant under Prosecutor Byrne. In July, 1967, the results of the 3 year experimental plan were embodied in the nation's first Statewide public defender plan, under the outstanding direction of the late Peter Murray, Esq., most ably assisted in Essex County by Leonard D. Ronco, Esq., (later Director of the N.J. Alcoholic Beverage Commission and now a Judge of the Superior Court). Mr. Murray, after his untimely death, was succeeded by Stanley Van Ness, Esq., then personal counsel to Governor Richard J. Hughes, and in turn he became head of the new Department of the Public Advocate with its creation in 1974, with authority to represent prison inmates not only in connection with their state trials and appeals, and later habeas petitions under 28 U.S.C. § 2254, but also in other matters, such as § 1983 suits, through the Division of Inmate Advocacy.

This history, well known in this District, makes it plain that long before *Bounds v. Smith, supra,* New Jersey recognized and undertook to discharge its constitutional obligations. The fact that it chose to do so by means of a system of public defenders and public advocates by no means implies that it has the further obligation to provide full libraries in every jail throughout the State. *Bounds v. Smith, supra,* makes clear that it has no such additional constitutional duty.

If the question were coming up for the first time and if this court were called upon to decide it, the experience it has over the decades would strongly persuade it to rule that the required legal assistance can be provided only through a system of professionally trained lawyers and staff, and would exclude as adequate the traditional law library.

In this court's view, access to the fullest law library anywhere is a useless and meaningless gesture in terms of the great mass of prisoners. The bulk and complexity have grown to such an extent that even experienced lawyers cannot function efficiently today without the support of special tools, such as the computer research systems of FLITE, JURIS, LEXIS and WESTLAW. To expect untrained laymen to work with entirely unfamiliar books, whose content they cannot understand, may be worthy of Lewis Carroll, but hardly satisfies the substance of the constitutional duty.

Access to full law libraries makes about as much sense as furnishing medical services through books like: "Brain Surgery Self-Taught", or "How to Remove Your Own Appendix", along with scalpels, drills, hemostats, sponges and sutures.

■ The issue is not new, however. The Supreme Court has ruled that the State's constitutional duty is to provide access to law books or access to trained lawyers. It does not require both. New Jersey had already chosen to provide lawyers, and in so doing it has discharged its duty.

Mr. Falzarano does not say it in words, but the facts and dates in his complaint make it obvious that he is freshly convicted and sentenced for some criminal offense. As an indigent, he has available to him for his direct appeals, and for any later federal habeas, the services of the N.J. Public Defender, and for other matters, those of the N.J. Public Advocate.

Having thus met its constitutional duty, New Jersey has no obligation to satisfy Mr. Falzarano's whim, if whim it be, to represent himself and provide him with a full library for that purpose.

The fact is, of course, that although not constitutionally obliged to do so, New Jersey does have substantial law libraries at its State prison, along with writ writers and other aids. This is an "extra", a bonus, whose use Mr. Falzarano may indulge in as soon as he is transferred from Essex County Jail to a state prison. The current overcrowding emergency merely means that he will have to wait his turn. He has no constitutional right to be first in line, and to be there today. The irrationality of the claim is reminiscent of the reply of Cyrano de Bergerac, implored by Christian after utter failure in his balcony exchange with Roxanne, to teach him to be eloquent, now, this moment. Cyrano replied: "How the devil am I to teach you now, this moment?" He pushed Christian into the shadows, and like a skilled attorney performed the famous balcony scene himself. Christian then reaped Roxanne's kiss as the reward for Cyrano's performance, outstandingly performed first by Walter Hampden and then by Jose Ferrer. This is what the subject is about.

■ The refusal to notarize except on conditions unacceptable to Mr. Falzarano is not a constitutional claim. By N.J. Court Rule 1:4–4 for the New Jersey courts, and by 28 U.S.C. § 1746 for the federal courts, no notary is needed for affidavits. A simple certification under penalty of perjury is sufficient. Both the writ writers and the public defenders know this. If he had the books, Mr. Falzarano would not know how or where to look up this primitive law.

■ The denial of certified mail, return receipt requested, at State expense also

falls far short of a constitutional issue. Ordinary mail is sufficient for access to the courts. If, for reasons of his own, a prisoner wants that form of mailing as a mode of proof, the cost is not so high as to put it beyond the reach of an indigent.

*Refusal to allow work assignments.*

 Falzarano says that on the day after he went to jail he applied for work. He was told that since he was a State prisoner, no work could be assigned to him. This same exchange occurred at least once more.

This claim raises no federal claim under § 1983. Work assignments to State prisoners are made at State institutions, not at county jails where a State prisoner is in transit. This issue arises due to the emergency conditions outlined above, and since the State is plainly taking all feasible steps to meet the unexpected emergency, this court sees no basis for considering the claim.

Not to be overlooked is the fact that, whatever the charge, Mr. Falzarano's problem exists only because he chose to engage in criminal conduct leading to his conviction. Just as the rainy season is the wrong time to take a vacation, the present jail emergency period is the wrong time to commit a crime.

*Missing personal property.*

 When Mr. Falzarano checked in at Essex County Jail he brought with him a carton of personal possessions he hoped to have access to in his cell. Some were taken and held as not allowed. He estimates their value at $20. So far, he has not secured their return.

The case of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ruled that a claim of this nature does not amount to one coming within § 1983.

Mr. Falzarano is doubtless too young to be aware of it, but much the same kind of thing happened to countless military draftees during World War II, which at its peak had some 10 million men and women in active service. Some of these reported on travel orders for active duty and took with them all kinds of personal belongings, including security blankets, no doubt, in the mistaken belief that an Army barracks was home and should have all the creature comforts. They learned otherwise on their first lineup at the base, and countless trinkets were taken away for consignment to the tender care of the military police and never seen again.

This was not an ideal situation then, and it is not one now. But whatever the imperfections may be, they do not rise to § 1983 claims. As noted in *Parratt*, New Jersey does have a N.J. Tort Claims Act under which administrative remedies are provided to prisoners for this kind of unfortunate loss, no matter how small.