**Alfreda TEAGUE, Plaintiff,**

v.

**Bernard WEINSTEIN, Commissioner of the Westchester County Medical Center, Cheryl Gainer, Acting Director of Nursing, Ann McKiernan, Acting Associate Director of Nursing, Jeffrey R. Sweet, Personnel Administrator, and the Westchester County Medical Center, Defendants.**

**No. 82 Civ. 4711 (RJW).**

United States District Court, S.D. New York.

Oct. 17, 1986.

Monroe Yale Mann, Port Chester, N.Y., for plaintiff.

Henry J. Logan, Co. Atty. by Brian J. Powers, Sr. Asst. Co. Atty., Westchester County, Dept. of Law, White Plains, N.Y., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT J. WARD, District Judge.

■ Plaintiff Alfreda Teague is a former employee of defendant Westchester County Medical Center (the "Medical Center").[1] Teague contends that the Medical Center coerced her resignation, tendered on June 14, 1982, from the position she held as a psychiatric nursing care coordinator ("PNCC") and furthermore that the Medical Center terminated her on the basis of her age. Teague brought suit against the Medical Center and several of its officers and employees alleging two causes of action based on 42 U.S.C. § 1983 and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. The Court tried the action without a jury on August 23, 26 and 27, 1985. The following represent the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

## FINDINGS OF FACT

Defendant Medical Center hired plaintiff, who was born on March 12, 1922, in the fall of 1970 as a supervising nurse on a per diem basis. She became an administrative head nurse in 1971 and a primary supervisor in 1973. Teague worked steadily until August 6, 1978 when she suffered a work-related back injury while subduing a patient. Plaintiff was absent from work recuperating from the injury until May 1979. Before her injury, Teague had worked the day shift except for those few occasions when she temporarily covered the night shift for other supervisors.

During plaintiff's absence, the Medical Center hired defendant Cheryl Gainer as the Acting Director of Nursing. When Teague returned to work on May 20, 1979, Gainer told her that for the needs of the division she was being assigned to the 3:00 p.m. to 11:30 p.m. evening shift. Teague contends she was overworked on the evening shift since, with fewer employees on duty, the evening supervisor had to exercise greater skill and experience. She further asserts that her "arbitrary reassignment" to the evening shift with its heavier workload was taken in retaliation for her long period of injury absence in that several other PNCCs who had less seniority than she should have been reassigned to evenings before she was. Plaintiff filed a grievance under the collective bargaining agreement procedure concerning her reassignment. After reviewing the grievance, First Deputy Commissioner George H. McCoy found the reassignment "appropriate in order to adequately meet the total need of the psychiatric nursing staff." Plaintiff's Ex. 4.

Following Teague's return, a sporadic series of incidents culminating with a fight between two staff members on Teague's shift the night of June 4, 1982 led defendant Gainer to call a disciplinary meeting at which she sought Teague's resignation. Because defendants contend these incidents underlie and justify Teague's dismissal, the Court will briefly review them.

On September 12, 1980 around 9:00 p.m. Teague noticed Dr. Wolfman attending a patient named "Timmy" who was being restrained with a straitjacket, euphemistically referred to throughout trial as a camisole.[2] Later that evening, Teague saw Timmy sitting next to Dr. Wolfman but no longer wearing the camisole. Teague testified that although she had not been in-

1. The Court notes, sadly, that plaintiff died following the trial. Her death does not abate the action.

2. As of September 12, 1980, Timmy's records indicated that he needed constant observation because of his "unpredictable, explosive-aggressive and self-destructive behavior." His treatment plan noted that a camisole should be used when the child became agitated to "prevent self-injury and injury to other[s]." Plaintiff's Ex. 9.

volved with the decision to remove the camisole, she had nevertheless removed it from Timmy's room and placed it in a locked supply closet to which only nursing supervisors had access. After locking the camisole in the closet, Teague informed the duty nurse that restraining a child in a camisole without a valid doctor's order was both illegal and unethical and that doing so could subject her to a malpractice claim.

On September 23, 1980, Gainer met with Teague to discuss her decision to place the camisole in the locked supply closet. Gainer told Teague that she had interfered with a treatment plan, which had included appropriate use of a camisole, formulated by the multidisciplinary team responsible for Timmy's treatment and suggested that her actions reflected personal convictions on child abuse. Gainer placed a rebuke in Teague's record. Although the parties contest whether Teague responded to or was allowed to respond to Gainer's assertions during the September 23 meeting, Teague later sumitted a lengthy memorandum outlining New York's Mental Hygiene Law, see N.Y. Mental Hyg. Law § 33, and explaining why the treatment plan that had been adopted for Timmy did not comply with the law. Plaintiff's Ex. 9. Gainer commended Teague for her thorough research, but refused to expunge the rebuke from Teague's record because Teague had not reviewed Timmy's treatment plan before locking the camisole in the supply closet and therefore could not have known whether the plan complied with New York law.

Several months later, on April 4, 1981, Teague posted on a lamp a brief note concerning Pat Joseph, a licensed practical nurse ("LPN") employed by the Medical Center.

> Please do not use Pat Joseph on 2 So. or everyone will go home!!
> Alfie
> and that's no idle threat.

Plaintiff's Ex. 5. Gainer rebuked Teague in writing for her "unprofessional and unacceptable" conduct and requested that she refrain from such casual communications even among her peers. Plaintiff's Ex. 6.

Teague's methods of communication continued to trouble Gainer and her successor Ann McKiernan. McKiernan expressed her concern in a memorandum dated May 20, 1982, in which she pointed to three specific instances where Teague had included in certain reports comments that McKiernan felt were inappropriate value judgments. Plaintiff's Ex. 8. McKiernan apparently spoke with Teague in person several times about her method of expressing herself as well, but neither the number nor the timing of those conferences appears in the record.

The incident that finally precipitated the formal disciplinary hearing of June 9, 1982 took place five days earlier on June 4, 1982 when a fight involving an orderly Ben Gamble and Karen Goldberg, one of the shift nurses occurred while Teague was on duty as a supervising nurse. Goldberg apparently had complained to Teague earlier that evening of the tension between her and Gamble, but Teague had deferred acting on Goldberg's request that she remove Gamble from the ward while she attended other matters which she deemed to be more urgent. The fight broke out in the interim.

On June 9, 1982, plaintiff was told to report that afternoon to the main nursing office for a meeting with Gainer, which she learned would be a disciplinary meeting. After learning the purpose of the meeting, Teague paged Sharon Fuller and told her that because this would be a disciplinary meeting she wanted Fuller to attend the meeting as her union representative to insure that any disciplinary action that might be taken then complied with the collective bargaining agreement.

Fuller accompanied Teague to the afternoon meeting as did her attorney Monroe Yale Mann. Gainer opened the meeting by stating that she wished to review carefully what she considered a pattern of substandard performance by Teague. Gainer went on to note that she had discussed previously with Teague her inability to identify and solve problems, actions Teague had taken

that undermined Medical Center policies, trouble Teague had handling nursing aides on the evening staff, and finally support Teague had given the nursing aides against the nursing staff. *See* Plaintiff's Ex. 17. Plaintiff's counsel Mr. Mann interrupted Gainer's elaboration of her accusations several times with his own comments, but he asked her no questions. Gainer asked Teague directly whether Karen Goldberg had requested that Teague intervene before the fight erupted on June 4, 1982. Mr. Mann directed Teague not to answer this question. When Mann then asked Gainer to substantiate her charges with specific facts, Gainer simply replied that she had facts to support her charges. Upon finishing her review, Gainer asked Teague to resign.

After Gainer had called for her resignation, Teague stepped out of the room to speak with Mann and Fuller. Fuller explained to Teague that if she was fired she would have access to the grievance procedure as set forth in the collective bargaining agreement but that if she resigned she would not. Fuller, Teague and Mann returned to the meeting. Gainer again asked Teague to resign and stated that if she did, no record of the June 4 incident would appear in her personnel folder. Fuller, Teague and Mann again left the room. Fuller reiterated her explanation of Teague's rights under the grievance procedure. Fuller returned to the meeting room alone and negotiated five days with pay for Teague to make her decision. Teague turned in her keys and identification card. She agreed not to call any employees on the evening shift while they were working.

Teague asserted during trial that defendants presented her the choice of resigning with retirement benefits and accrued time or of being fired and losing the retirement benefits. Gainer testified that in conducting the meeting and in recommending disciplinary action against Teague she followed the procedures set out in the collective bargaining agreement between the county and the nurses association. She further testified that she believed that when she had asked for Teague's resignation she had

had cause to do so. By the weight of the credible evidence, including the testimony of Gainer, McKiernan, Jeffrey Stewart, the Medical Center's Personnel Director, and Teague's own representative Sharon Fuller, the Court finds that none of those present at the meeting threatened Teague with the loss of her retirement benefits in the event she refused to resign.

On June 14, 1982, after consulting with Mann, Teague submitted a letter of resignation. Plaintiff revoked this first handwritten resignation by tearing it in two.

Dear Ms. Gainer:

Please accept my resignation, effective as of this date. Per our conversation I shall expect to receive accrued time, vacation, etc., that is due.

Very truly yours,
s/ Alfreda E. Teague

Plaintiff's Ex. 11. Later that day, Teague submitted another typewritten resignation.

Dear Ms. Gainer:

As you know, we met on Wednesday, June 9, 1982 with Mr. Sweet, Personnel Director, and you and he both, advised me that unless I resigned, I would be terminated and I would lose my earned benefits which would include retirement. I cannot afford this loss, and in view of the contemplated action you have indicated you would take, I herewith submit my resignation.

Sincerely yours,
s/ Alfreda E. Teague

Plaintiff's Ex. 10.

In a letter dated June 16, 1982, Sweet replied to Teague's letter to correct what he considered certain misstatements.

Dear Mrs. Teague:

I am in receipt of your resignation letter dated June 14, 1982, and am concerned that it contains certain misinformation concerning our meeting of June 9, 1982. Your resignation was requested and the possibility of terminating your appointment was discussed. However, you were advised of the appeal process available to you under the NYSNA contract. Indeed,

your attorney, Monroe Mann, requested a copy of the contract which was to be transmitted to him.

In the event of a termination with cause, you could be denied accrued vacation and sick leave. No other benefit could be denied. Denial of retirement benefits was not discussed at this meeting. In fact, I had indicated to your NYSNA representative, Sharon Fuller, that retirement was an acceptable resolution of this matter.

I believe the above represents an accurate account of this meeting.

> Very truly yours,
> s/ Jeffrey R. Sweet
> Program Administrator

Plaintiff's Ex. 12 A.

After Teague received Sweet's letter, Mann responded with a letter dated June 23, 1982 by which he attempted to withdraw Teague's resignation.

Dear Mr. Sweet:

I have your letter of June 16, 1982, addressed to my client Miss Alfreda Teague. I, along with Miss Teague, as you well know, was present and I took notes at the meeting. The condition included statements by both you and Cheryl Gainer, that unless she resigned, all benefits would be terminated, and this included retirement benefits, and that she would be given an oportunity to resign so that her retirement benefits would not be lost. If you now wish to state that her retirement benefits will not be denied, then, of course, there is no reason for her to resign, and the resignation dated June 14, 1982, is hereby withdrawn.

\* \* \* \* \* \*

> Sincerely yours,
> s/ Monroe Mann

Plaintiff's Ex. 12B. Bernard Weinstein, Commissioner of the Medical Center, refused to accept the attempted withdrawal and declined to reinstate Teague.

Dear Ms. Teague:

By letter, dated June 14, 1982, you resigned from your employment with Westchester County and you have been removed from the County payroll effective June 15, 1982, the date the aforesaid letter was received.

By letter, dated June 23, 1982, your attorney, Monroe Yale Mann, with your approval, sought to withdraw your resignation. The County of Westchester hereby refuses to consent to the withdrawal and hereby refuses to reinstate you.

> Very truly yours,
> s/ Bernard M. Weinstein
> Commissioner

Plaintiff's Ex. 12. Teague sued once the Medical Center had replaced her with two younger persons.

## CONCLUSIONS OF LAW

### A. Section 1983.

■ At trial Teague relied heavily on section 1983. To sustain her claim Teague must prove that a person acting under color of state law committed acts that deprived her of a right, privilege or immunity guaranteed by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). Plaintiff has asserted that Medical Center personnel violated her Fourteenth Amendment right to due process when various of the defendants coerced her into resigning from her employment as a PNCC with threats made during the June 9, 1982 disciplinary meeting. In deciding the section 1983 claim, the Court must address first the sufficiency and propriety of Teague's initial resignation since by voluntarily tendering a resignation that was properly accepted by the appropriate officials, Teague would have extinguished her right to a hearing along with any protectable property rights she might have had in her continued employment at the Medical Center.[3]

---

3. In addition to a property right in continued employment Teague might have had as well a

Nothing in the circumstances surrounding Teague's resignation suggests that any of the defendants coerced her into resigning. Teague appeared at the June 9, 1982 meeting with a union representative and legal counsel after receiving notice that it would be a disciplinary hearing. Twice during the meeting Teague stepped outside the room to discuss the proceedings with Fuller and Mann. Both times Fuller explained to Teague that under the collective bargaining agreement if she was fired she could resort to the grievance procedure but that if she resigned she could not. Her union representative negotiated a five day period to consider her choices, and, after consulting with her attorney, Teague submitted her letter of resignation. The circumstances of the meeting itself, then, did not taint Teague's resignation.[4]

■ Nor did any of the defendants improperly threaten Teague during the meeting. As the Court found above, Teague was never threatened with the loss of her retirement benefits which, as Sweet conceded in his June 16 letter, could not be denied her even were Teague to be fired for cause. Defendant Gainer did explain to Teague that if she resigned no mention of the altercation between Gamble and Goldberg would appear in her personnel records. Under applicable New York law, however, Gainer's threat, whether implicit or explicit, to include an account of the fight would not invalidate Teague's subsequent resignation. The "threat to do that which one has a legal right to do does not constitute duress." *Cacchioli v. Hoberman*, 31 N.Y.2d 287, 292, 338 N.Y.S.2d 865, 868, 291 N.E.2d 117, 119 (1972); *Rychlick v. Coughlin*, 99 A.D.2d 863, 472 N.Y.S.2d

761, 763 (3rd Dep't.1984). As the Acting Director of Nursing, Gainer had a duty to maintain personnel records which would normally include accounts of incidents such as the fight. Standing alone, her promise to include the incident in Teague's record would not amount to duress.

■ Gainer could not, of course, have bludgeoned Teague into submitting her resignation by threatening to discharge her for incidents that she knew did not amount to cause or to compromise Teague's future employment with an unfavorable and unsubstantiated reference. *See, e.g., Farrar v. State of New York*, 92 A.D.2d 546, 459 N.Y.S.2d 114 (2d Dep't.1983) (therapy aide reinstated when resignation had been based on unproven allegations of misconduct). Gainer made no such threats. She testified that at the time she demanded Teague's resignation she believed just cause existed to terminate Teague. In light of the several incidents that preceded the meeting, the Court cannot conclude that Gainer's belief was without support or that Teague would necessarily have been reinstated had she appealed her termination through the grievance procedure. Furthermore, Teague has never asserted that Gainer threatened to describe unfairly her role in or responsibility for the fight between Gamble and Goldberg or to give a poor reference. None of the threats or promises made at the June 9 meeting to induce Teague to resign vitiated that resignation. In sum, Teague resigned voluntarily.

The more nettlesome problem concerns Teague's attempt to withdraw her resignation. Because the Court has found on the

---

liberty interest in her professional reputation as it affected her prospect for future employment. *See, e.g., Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976); *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). She has not, however, made any claim concerning her reputation.

**4.** The New York Court of Appeals upheld a finding of no duress in circumstances much more compelling than these. *See DeMarco v. McLaughlin*, 69 A.D.2d 882, 415 N.Y.S.2d 1008

(2d Dep't.1979) *aff'd*, 49 N.Y.S.2d 941, 428 N.Y.S.2d 624, 406 N.E.2d 441 (1980) (police officer given the choice of resigning within the hour or facing formal misconduct charges despite being severely depressed and medicated with both sedatives and tranquilizers resigned voluntarily). *Cf. Willis v. VonHolden*, 67 A.D.2d 810, 413 N.Y.S.2d 47 (4th Dept.1979); *Lelio v. Rutkowski*, 127 Misc.2d 383, 486 N.Y.S.2d 587 (S.Ct.1984), *aff'd*, 109 A.D.2d 1066, 486 N.Y.S.2d 1023 (4th Dept.1985).

facts presented at trial that Teague voluntarily submitted her resignation, the remaining argument must be that Commissioner Weinstein deprived Teague of her right to a hearing on the reasons for her discharge, which would have been otherwise available had she not resigned, when he refused to accede to the withdrawal of her resignation.[5] While the common law seemingly holds that to be effective a public employee's resignation must have been accepted, *see, e.g., Goodman v. United States,* 424 F.2d 914, 918 (D.C.Cir.1970); *Haine v. Googe,* 248 F.Supp. 349, 352 (S.D. N.Y.1965) (Weinfeld, J.), at least one New York case indicates the contrary. *Vito v. DiCarlo,* 52 Misc.2d 205, 275 N.Y.S.2d 412 (S.Ct.N.Y.Co.1964). The Court need not tarry over the distinction, however, since either way the Medical Center would remain free to consent to Teague's withdrawing her resignation even after it had been accepted. Because the parties neither briefed nor argued the point, the Court will not here decide whether Commissioner Weinstein abused his discretion in denying the withdrawal, beyond noting first that

Teague's resignation letter itself apprised the Medical Center that she had done so on the belief, albeit as the Court has found a mistaken belief, that she might lose her retirement benefits if she was fired and second that Teague moved promptly to withdraw the resignation once Sweet's letter corrected her misimpression.[6]

Even assuming *arguendo,* that the clause in the collective bargaining agreement that specified that the Medical center could discharge employees only for cause created a cognizable property interest, and assuming further that Weinstein abused his discretion in not consenting to the withdrawal of Teague's resignation, however, Teague has still made out no cause of action. It is axiomatic that the Fourteenth Amendment prohibits only deprivations of liberty or property that have been taken without adequate process. *See Daniels v. Williams,* —— U.S. ——, ——, 106 S.Ct. 662, 677, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring). When the state provides an adequate, alternative method to review the taking, there has been no due

---

**5.** Had Teague refused to resign, she could have challenged her subsequent dismissal through the Disciplinary Grievance Procedure as set out in the Agreement Between the County of Westchester and the New York State Nurses Association in effect at that time. Defendants' Ex. D at § 11.06. The procedure requires the appropriate Department Head to hold a hearing within ten days and to respond in writing ten days thereafter. An aggrieved employee can appeal a negative decision to the American Arbitration Association. *Id.*

Although Teague voluntarily resigned after the disciplinary meeting, the meeting itself was hardly a model of fairness and the Court would be loathe to endorse the procedures followed there. In light of the outcome of this case, the Court need not decide whether or what sort of hearing Teague was entitled to before termination, but would adhere to the observation that the disciplinary meeting lacked the rudiments of a due process hearing.

**6.** New York courts have found an abuse of discretion in refusing to accept a withdrawal when the circumstances that initially prompted the resignation changed without requiring the more compelling circumstances, as here, that the employee have relied on a mistaken reason for resigning. *Farrar v. State of New York,* 92 A.D.2d 546, 459 N.Y.S.2d 114 (2d Dep't.1983) (abuse of discretion to refuse withdrawal of

resignation on basis of unproved allegations of misconduct when alternative employment prospect which had in part prompted the resignation disappeared); *Wonderly v. Division of New York State Police,* 80 A.D.2d 974, 438 N.Y.S.2d 611 (3rd Dep't.1981) (officer who resigned rather than face charges entitled to withdraw resignation if done promptly). Accepting the withdrawal of her resignation would not have obligated the Medical Center to reemploy Teague, but it would have allowed Teague access to the disciplinary grievance procedure to which she would have been entitled had she not resigned. The Court would note that, as the circuit panel in *Goodman v. United States, supra,* observed, requiring the Medical Center to forgo Teague's resignation and provide her a hearing would not impose any undue administrative burden on the Medical Center since the hearing procedure includes nothing more, or less, than that required to remove an employee who refuses to resign. Teague attempted to withdraw her resignation promptly and therefore the Medical Center at her hearing would not have been compromised by having to present or defend stale allegations. Had Teague been allowed a hearing, this case would never have reached the federal courts and Westchester County would have been spared its attendant expense.

process violation and the taking therefore will not support a section 1983 action. *Parratt v. Taylor,* 451 U.S. 527, 540–43, 101 S.Ct. 1908, 1915–16, 68 L.Ed.2d 420 (1981). The Court, without the benefit of briefing, perceives at least two ways by which Teague could have challenged Commissioner Weinstein's decision. First, Teague could have asked her union representative to grieve Weinstein's decision not to allow her to withdraw the tendered resignation through the collective bargaining agreement process.[7] Had the union declined to pursue Teague's request, she could have resorted to the courts by alleging that the union had breached its duty of fair representation. Second, Teague could have instituted an Article 78 proceeding to review Weinstein's action directly. *See generally* J. Weinstein H. Korn & A. Miller, *New York Civil Practice* § 7801 *et seq.* (1985). In light of these two procedures, Teague's argument for her purported cause of action would have to presume some facial inadequacy in the two procedures alluded to above. *Daniels v. Williams, supra,* —— U.S. at ——, 106 S.Ct. at 677. The procedures Teague had available are not facially inadequate. Consequently, since Teague did not seek review of Weinstein's decision, she has made out no constitutional violation.

### B. Age Discrimination.

In an action brought under the ADEA, a plaintiff has the burden of establishing a *prima facie* case. If a plaintiff meets this burden, a defendant must come forward and articulate some legitimate, non-discriminatory reason for the challenged action. Plaintiff must then show that the reason offered was pretextual. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Haskell v. Kaman Corp.,* 743 F.2d 113, 119 (2d Cir.1984); *Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 80–82 (2d Cir.1983); *EEOC v. Trans World Airlines,* 544 F.Supp. 1187, 1217 (S.D.N.Y.1982).

7. *See* Defendant's Ex. D §§ 5.03, 11.06.

Plaintiff met her initial burden by proving that she was within the protected age group at the time of her resignation and was replaced by two younger persons. She failed however to rebut defendants' evidence of substandard job performance.

### CONCLUSION

Plaintiff did not seek review under adequate, available state procedures of Commissioner Weinstein's decision to refuse to allow her to withdraw her resignation. Consequently she has made out no Fourteenth Amendment Due Process violation to support a claim under section 1983. Plaintiff also failed to rebut as pretextual the reasons offered by defendant Medical Center for her discharge. Her age discrimination claim, therefore, likewise fails. The Court accordingly must find for defendants on both the section 1983 claim and the age discrimination claim.

Settle judgment on notice.

