## Lyddy v. Lyddy
*[Cite as 7 AOA 186]*

*Case No. L-89-245*
*Lucas County, (6th)*
*Decided October 19, 1990*

*Donna M. Engwert-Loyd, for Appellant.*

*Peter L. Moran, for Appellee.*

This matter is before the court on appeal from a qualified domestic relations order issued July 19, 1989, by the Lucas County Court of Common Pleas, Domestic Relations Division.

On November 19, 1981, appellant, Leo L. Lyddy, and appellee, Veronica M. Lyddy, were granted a divorce after a twenty-four year marriage. As part of its judgment entry, the trial court ordered Leo Lyddy to pay Veronica Lyddy $900 per month as sustenance alimony. The court stated that the alimony award would be reviewed in five years at which time the court would consider Veronica Lyddy's ability to support herself. The court further awarded Leo Lyddy all rights in his General Motors pension fund.

On September 8, 1986, Leo Lyddy filed a motion to modify or terminate alimony. That motion was found not well-taken in a November 19, 1986 judgment entry and affirmed and finalized in an order on November 25, 1987. Leo Lyddy appealed that order, which this court affirmed on October 21, 1988. Thus, the original alimony order remained in effect.

In November 1986, Leo Lyddy ceased making his monthly alimony payments to Veronica Lyddy. In response, Veronica Lyddy filed a motion to show cause, for lump sum judgment, for incarceration and to join the Administrator of the General Motors Retirement Program for Salaried Employees as a party-defendant.

On November 16, 1987, the trial court entered a default judgment against Leo Lyddy, finding that he had been duly notified of the September 10, 1987 hearing and had failed to appear. The court awarded Veronica Lyddy a lump sum judgment of $8,550 which comprised the alimony in arrears as of September 7, 1987. The court ordered Leo Lyddy to pay Veronica Lyddy $900 per month plus an additional $500 per month on the arrearage and ordered that a wage withholding statement be filed for such support. The court further ordered that the Administrator of the General Motors pension fund be joined as a party-defendant and entered a qualified domestic relations order ("QDRO") withholding $900 per month continuing alimony and an additional $500 per month to apply on the arrearage. The court then enjoined the Administrator from disbursing any of Leo Lyddy's pension benefits until it received the QDRO pertaining to those benefits.

Leo Lyddy continued to refuse to make any alimony payments to Veronica Lyddy. On June 10, 1988, the trial court filed a second QDRO (the first had not been accepted by the Administrator), ordering the Administrator to pay Veronica Lyddy $900 per month, plus $500 per month on the arrearage, out of Leo Lyddy's accrued benefits, so long as the same did not exceed the limits set forth in Section 303(b) of the Consumer Credit Protection Act. Section 1673(b), Title 15, U.S. Code. The order further stated that until the QDRO was accepted by the Administrator, the court retained jurisdiction to modify the same.

In October 1988, the QDRO had not yet been accepted by the Administrator, and Leo Lyddy continued to fail to pay on the judgment entered against him. Veronica Lyddy thus filed another motion to show cause, for lump sum judgment and for fees and costs against Leo Lyddy. On December 15, 1988, the trial court entered a default judgment against Leo Lyddy, again noting his failure to appear after being duly notified. The court awarded Veronica

Lyddy a lump sum judgment of $21,150, the amount of the arrearage as of October 18, 1988.

On April 5, 1989, having yet to receive her alimony payments, Veronica Lyddy filed a motion to show cause and for payment of alimony against the Administrator of the General Motors Retirement Program for Salaried Employees. Consequently, the trial court on May 2, 1989, filed a *nunc pro tunc* QDRO directing the Administrator to pay Veronica Lyddy accordingly.Pursuant to this order, the Child Support Enforcement Agency ("CSEA") investigated the parties' employment and income status and found that as of July 4, 1989, Leo Lyddy's arrearages amounted to $29,250.

The prior QDRO still being unacceptable to the Administrator, on July 19, 1989, the trial court, with some assistance from the General Motors pension fund counsel, entered a final QDRO ordering the Administrator to pay Veronica Lyddy $900 per month in alimony and $500 per month on the $29,250 arrearage. Finally, on August 1, 1989, the Administrator accepted the QDRO.

It is from the trial court's QDRO of July 19, 1989 that Leo Lyddy has filed this timely appeal, setting forth the following assignments of error:

"FIRST ASSIGNMENT OF ERROR
THE TRIAL COURT'S ORDER ESTABLISHING A QUALIFIED DOMESTIC RELATIONS ORDER, PREDICATED UPON SECTION 3113.21 O.R.C., IS VOID AS ITS APPLICATION IN THE INSTANT CASE IS UNCONSTITUTIONAL.

"SECOND ASSIGNMENT OF ERROR
THE QUALIFIED DOMESTIC RELATIONS ORDER VIOLATES APPELLANT'S DUE PROCESS RIGHTS UNDER BOTH OHIO AND FEDERAL CONSTITUTIONS IN THAT REASONABLE NOTICE REQUIREMENTS TO APPELLANT HAVE NOT BEEN SATISFIED.

"THIRD ASSIGNMENT OF ERROR
THE TRIAL COURT ERRED IN NOT MAKING A DETERMINATION AS TO THE MAXIMUM AMOUNT PERMITTED TO BE WITHELD [sic] FROM APPELLANT'S PENSION IN CONTRAVENTION OF SECTION 303 OF THE CONSUMER PROTECTION ACT (15 U.S.C.1673)."

Before addressing appellant's assignments of error, we find that the following quote from a recent decision of the Supreme Court of Ohio would be helpful in our discussion of this case.

"A QDRO is a qualified domestic relations order 'which creates or recognizes the existence of an alternate payee s right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan \*\*\*.' Employee Retirement Income Security Act of 1974 ('ERISA') Section 206(d)(3)(B)(i)(I) and Section 414(p)(1)(A)(i), Title 26 U.S. Code. Under the Retirement Equity Act of 1984 ('REA'), the QDRO allows the transfer of retirement benefits to an alternate payee (generally the former spouse) without triggering the anti-assignment or alienation provision of a retirement plan. \*\*\* The QDRO must be drafted to include very specific information with explicit instructions to the plan administrator. It is then the responsibility of the plan administrator to review the order of the trial court and determine whether it constitutes a QDRO pursuant to Section 414(p), Title 26, U.S. Code." *Hoyt v. Hoyt* (1990), 53 Ohio St. 3d 177, 179-180.

In his first assignment of error, Leo Lyddy contends that because he had a vested property right in his pension plan prior to the enactment of the applicable provisions of R.C. 3113.21 and ERISA, the trial court's retroactive application of these statutes through its QDRO amounted to an unconstitutional taking of his property without due process of law.

Retroactive legislation which is remedial in nature gives a new remedy for the enforcement of an existing right. *Gager v. Prout* (1891), 48 Ohio St. 89. Such legislation, although retroactive or retroactively applied, does not violate the constitutional prohibition against retroactive laws. In the case before us, Leo Lyddy was granted his pension benefits in 1981. At that time there was ample legislation authorizing the attachment of pension benefits to secure the payment of court-ordered alimony. R.C. 3105.11[1] and 3105.18(B),[2] which were in force in their present form in 1981, have been interpreted as providing for such a remedy. *Dayton v. Dayton* (1987), 40 Ohio App. 3d 17, 18. Moreover, the anti-alienation and assignment provision of ERISA, Section 1056(d) (1), Title 29, U.S. Code,[3] also in force in 1981 has been interpreted by numerous federal and state courts as never having been intended by Congress to immunize pension benefits from attachment or garnishment orders to enforce a support decree. *Dayton v. Dayton, supra,* at 19; *Pepitone v. Pepitone*

(1981), 436 N.Y.S. 2d 966; *Ward v. Ward* (1978), 164 N.J. Super. 354; *Operating Engineers' Local No. 428 Pension Trust Fund v. Zamborsky* (D.C. Ariz. 1979), 470 F. Supp. 1174, affirmed (1981), 650 F. 2d 196.

Thus, when Leo and Veronica Lyddy divorced in 1981, although Leo Lyddy was granted his pension benefits, those were *at that time* subject to attachment or garnishment if he failed to make his alimony payments. The laws enacted since then, R.C. 3113.21 and Section 1056(d) (3), Title 29, U.S. Code, do not change this but simply give a new remedy by which an obligee can enforce an existing right--*i.e.*, the right to court-ordered support payments. Thus, we do not find that the trial court's QDRO of July 19, 1989, amounted to an unconstitutional retroactive application of the statutes.

We further note that the Supreme Court of Ohio, in a case nearly identical to the case before us, specifically held that an obligor's pension benefits could be attached to enforce a previously decreed support order, even though the obligee was not awarded direct access to those pension benefits in the original divorce decree. *Taylor v. Taylor* (1989), 44 Ohio St. 3d 61, 62. In *Taylor*, the parties were divorced in 1980. Mrs. Taylor was awarded permanent alimony of $350 per month, and Mr. Taylor was awarded his retirement account. After Mr. Taylor began receiving his pension benefits in July 1985, he ceased making his required alimony payments. By December 1986, he was in arrears by $16,450. In holding that the trial court could issue a QDRO withholding benefits from Mr. Taylor's ERISA-governed pension plan, the Supreme Court of Ohio did not expressly address the constitutional claim being made by appellant herein. However, the court did state that R.C. 3113.21 applies to any form of income, and that so long as the order is a QDRO, an ERISA-governed pension plan may be attached. *Id.* at 64. We find that under this holding the trial court in the case before us was authorized to issue the QDRO attaching Leo Lyddy's pension benefits.

Accordingly, appellant's first assignment of error is found not well-taken.

In his second assignment of error, Leo Lyddy claims that the QDRO of July 19, 1989 violated his due process rights and that he was not reasonably notified until that time that the alimony arrearage would equal $29,250. Specifically, Leo Lyddy argues that he was never given reasonable notice of the trial court's orders or of the investigations and findings of the CSEA. Therefore, he claims, because the original QDRO of November 16, 1987 granted Veronica Lyddy a default judgment for $8,550, this is the only sum, if any, for which he should be liable.

We first note that on December 15, 1988, the trial court entered a default judgment against Leo Lyddy for $21,150 after he failed to appear for a hearing on Veronica Lyddy's motion to show cause. The court noted that Leo Lyddy had been duly notified of the hearing. It is well-settled law in Ohio that where a judgment is entered against a party who is in default for failure to appear, there is no requirement that the clerk of courts serve notice of any final appealable judgment or order on that party. See *Atkinson v. Grumman Ohio Corp.* (1988), 37 Ohio St. 3d 80; see, also, *Hall v. K.V.V. Enterprises* (1984), 15 Ohio App. 3d 137; *Town & Country Drive-In Shopping Centers, Inc. v. Abraham* (1975), 46 Ohio App. 2d 262. Consequently, to the extent that the trial court entered a default judgment against Leo Lyddy for alimony arrearages of $21,150 Leo Lyddy has no due process argument. He was given notice of the hearing and had an opportunity to appear and refute the charges. By failing to appear after being duly notified, Leo Lyddy waived any right to challenge that order.

We do find, however, certain irregularities in the CSEA's procedures which resulted in the QDRO of July 19, 1989. On July 18, 1989, the CSEA filed its investigation findings and recommendations and its notice to obligor with the trial court pursuant to R.C. 3113.21(B) (2) and (3). In that report, the CSEA found that Leo Lyddy was in arrears in his alimony payments by $29,250. The following day, the trial court entered its QDRO, ordering the previously stated amounts withheld from his monthly pension benefits.

When seizures of property occur under the color of established state procedures due process generally requires that notice and a hearing be provided to serve as a check on wrongful deprivation. *Parratt v. Taylor* (1981), 451 U.S. 527, 541. Ohio's statute, R.C. 3113.21, which confers the right to garnish an obligor's pension benefits to fulfill a support obligation, comports with due process requirements by requiring a pre-deprivation notice and hearing(s). Under R.C. 3113.21, in any court proceedings involving a support order which are commenced before, on, or after December 1, 1986, and in which the

court determines that there is a need to modify any withholding orders previously issued, the court is required to order the bureau of support (i.e., CSEA) to conduct an investigation. R.C. 3113.21(B) (4). This investigation is conducted by the bureau of support to ascertain the obligor's employment status, social security number, any arrearages in support and "any other information" that would enable the court to issue a support payment order. R.C. 3113.21(B) (3). Upon the filing of findings with the court the bureau is *required* to send notice to both the obligor and the obligee. *Id.* The notice to the obligor must contain the following specific information:

"(i) A copy of its findings;

"(ii) A notice that contains the date on which the notice is sent, the amount of any arrearages owed by the obligor as determined by the agency, the types of orders as determined by the agency, the types of orders described in division (D) of this section that will be issued to pay support and any arrearages, the amount that will be withheld or deducted pursuant to those orders, a statement that any order for the withholding or deducting of an amount from personal earnings or other income will apply to all subsequent employers of the obligor, financial institutions in which the obligor has an account, and other persons who pay or distribute income to the obligor, a statement that any order described in division (D) of this section that is issued will not be discontinued solely because the obligor pays any arrearages, and an explanation of the administrative and court action that will take place if the obligor contests the issuance of any of the orders;

"(iii) A conspicuous notice that if the obligor, pursuant to division (B)(2) of this section, does not request the issuance of orders described in division (D) of this section, he may contest the inclusion of an amount to pay arrearages in any order described in division (D) of this section by filing with the child support enforcement agency, within ten days after the day on which the notice was sent to him pursuant to this division, a request that the agency hold a hearing pursuant to division (B)(1) of this section to determine whether, because of a mistake of fact, it is not proper to include an amount to pay arrearages in any orders issued pursuant to division (D) of this section;

"(iv) A notice that one or more orders described in division (D) of this section will be issued and that, if the obligor does not request a hearing in accordance with division (B)(3)(c) of this section, the child support enforcement agency determines that the obligor is in default under the order, and the court concurs in the agency's determination, the orders will require that the amount of money with-held or deducted include an amount to pay arrearages."

Moreover, R.C. 3113.21(G) (1) provides:

"Service and notice on any party *** for purposes of division (B),(C) or (D) of this section, may be made by personal service or ordinary first class mail directed to the addressee at his last known address, or, in the case of a corporation, at its usual place of doing business. *Any service of notice by ordinary first class mail shall be evidenced by a certificate of mailing filed with the clerk of the court.*" (Emphasis added.)

In the case before us, there is no evidence in the record to indicate that the CSEA ever sent notice of it's, report to Leo Lyddy as required by R.C. 3113.21(B)(3). Furthermore, because the trial court entered its QDRO the day after the CSEA filed its report, Leo Lyddy was denied an opportunity to file a written request for a hearing. Accordingly, to the extent that the trial court found Leo Lyddy's arrearage to exceed $21,150, Leo Lyddy was denied his right to due process.

Accordingly, appellant's second assignment of error is found well-taken. This cause will be remanded to the trial court so that Leo Lyddy may have an opportunity to refute the CSEA's finding that his arrearage equaled $29,250 as of July 4, 1989.

In his third and final assignment of error, appellant asserts that the trial court erred in failing to follow, in its QDRO of July 19, 1989, the limitations on withholding as set forth in R.C. 3113.21.

Under R.C. 3113.21(D)(3)(a), a domestic relations court is authorized to attach pension benefits in order to satisfy support obligations and arrearages. However, that division further provides:

"*** in no case shall the sum of the amount specified in the order to be withheld and any fee withheld by the board, board of trustees, or other entity as a charge for its services exceed the maximum amount permitted under section 303(b) of the 'Consumer Credit Protection Act,' 15 U.S.C. 1673(b)."

Those limits, as set forth in Section 1673, Title 15, U.S. Code, are as follows:

"(b)(2) The maximum part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment to enforce any order for the support of any person shall not exceed--

"(A) where such individual is supporting his spouse or defendant child (other than a spouse or child with respect to whose support such order is used), 50 per centum of such individual's disposable earnings for that week; and

"(B) where such individual is not supporting such a spouse or dependent child described in clause (A), 60 per centum of such individual's disposable earnings for that week;

"except that, with respect to the disposable earnings of any individual for any workweek, the 50 per centum specified in clause (A) shall be deemed to be 55 per centum and the 60 per centum specified in clause (B) shall be deemed to be 65 per centum, if and to the extent that such earnings are subject to garnishment to enforce a support order with respect to a period which is prior to the twelve-week period which ends with the beginning of such workweek."

Leo Lyddy asserts that the trial court's failure to specify in its QDRO of July 19, 1989 which percentage was applicable is reversible error.

Nowhere in R.C. 3113.21 is it stated that a withholding order must expressly state that the amount to be withheld cannot exceed the limits of the Consumer Credit Protection Act. Moreover, ERISA specifies exactly what the QDRO must include:

"(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

"(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

"(iii) the number of payments or period to which such order applies, and

"(iv) each plan to which such order applies." Section 1056(d)(3)(C), Title 29, U.S. Code.

Therefore, while R.C. 3113.21 mandates that the amount to be withheld not exceed the limits of the Consumer Credit Protection Act, a statement to that effect need not be included in the QDRO, and the court's failure to include such a statement is not grounds for a reversal.

Leo Lyddy further claims that the $1,400 ordered withheld from his monthly pension benefits far exceeds-he fifty-five, sixty or sixty-five percent of his monthly disposable earnings. There is no evidence in the record as to what appellant's monthly income was at the time the court entered its final QDRO. Under R.C. 3113.21, the trial court relies on the CSEA report to determine what amount to order withheld. However, as discussed, *supra*, the court below relied on the CSEA report without giving Leo Lyddy notice of the report and an opportunity to request a mistake of fact hearing. Although earlier QDRO's, also based on CSEA reports, ordered the same amount withheld, the record and docket sheet indicate a similar failure of the CSEA to send notice of these reports to Leo Lyddy pursuant to R.C. 3113.21(G) (1). Thus, there is no evidence in the record that Leo Lyddy was given an opportunity to object to the withholding and establish that it exceeded the limits of the Consumer Credit Protection Act.

Accordingly, appellant's third assignment of error is found well-taken.

On consideration whereof, the court finds substantial justice has not been done in all respects the party complaining, and the judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, is affirmed in part and reversed in part. This cause is remanded to said court for further proceedings not inconsistent with this decision. It is ordered that both parties pay their own court costs of this appeal.

GLASSER, J., and RESNICK, J., concur.

ABOOD, J., concurs in judgment only.

---

[1] R.C. 3105.011 reads:

"The court of common pleas including divisions of courts of domestic relations, has full equitable powers and jurisdiction appropriate to the determination of all domestic relations matters. This section is not a determination by the general assembly that such equitable powers and jurisdiction do not exist with respect to any such matter."

[2] R.C. 3105.18(B) reads, in pertinent part:

"In determining whether alimony is necessary, and in determining the nature, amount, and manner of payment of alimony, the court shall consider all relevant factors, including, but not limited to, the following:

"* * *

"(3) The retirement benefits of the parties; *** ."

[3] Section 1056(d) (1), Title 29, U.S. Code provides:

"(d) Assignment or alienation of plan benefits

"(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."