**James HUDSON, Chairman F3352 Harold X (Smith) F6433 Administrative Assistant to the Chairman Joseph Baynes F7102 Treasure Pro–Tempore Pennsylvania Association for Lifers at Pittsburgh Non–Profit Corporation, Plaintiffs,**

v.

**Richard THORNBURGH, Governor George Petsock, Superintendent, SCIP, Lt. Andolina, G. Urich, Capt. C.J. Walsh, Lt., Defendants.**

Civ. A. No. 83–2084.

United States District Court, W.D. Pennsylvania.

Aug. 12, 1991.

---

James Hudson, pro se.

Joseph Baynes, pro se.

Harold X (Smith), pro se.

Donna McClelland, Pittsburgh, Pa., for defendants.

## OPINION

COHILL, Chief Judge.

One of the demands placed on the federal courts in the last several decades has been to define and determine the fine line between the rights of incarcerated prisoners to receive humane treatment and the entitlement of society to the punishment of, and protection from, those same prisoners. It has been our lot to be deeply involved in several of these controversies. *See, Owens–El v. Robinson,* 442 F.Supp. 1368 (W.D.Pa.1978) and *Owens–El v. Robinson,* 457 F.Supp. 984 (W.D.Pa.1978); *aff'd Inmates of the Allegheny County Jail v. Peirce,* 612 F.2d 754 (3d Cir.1979) and their related progeny, dealing with conditions in the Allegheny County Jail. *See also Till-*

ery v. Owens, 719 F.Supp. 1256 (W.D.Pa. 1989), aff'd Tillery v. Owens, 907 F.2d 418 (3d Cir.1990) dealing with conditions in the State Correctional Institution at Pittsburgh.

In this case we find that the plaintiff-inmates have overstepped the line.

Between June 10, 1991 and June 15, 1991 this Court conducted a non-jury trial on the above captioned case. Upon consideration of the evidence presented at trial we make the following findings of fact and conclusions of law in accordance with Fed. R.Civ.P. 52 and find in favor of the defendants. The plaintiffs presented their case pro se (without counsel), and for that reason, we gave them a good deal more latitude in asking and answering questions than we would have under normal circumstances.

### The Issues

In their complaint, the plaintiffs alleged that the defendants, former Superintendent George Petsock, former Governor Richard Thornburgh and others, disbanded the Pennsylvania Association of Lifers ("PAL") at the State Correctional Institution at Pittsburgh ("SCIP") because black prisoners were running the organization. Plaintiffs, James Hudson and Joseph Baynes, are two life sentenced prisoners who were members of the PAL board when it was disbanded. They are both black. Harold X (Smith), the third plaintiff, did not participate in the trial. Harold X (Smith) was Mr. Hudson's administrative assistant when the PAL was disbanded, but he was not a member of the board, and he was not serving a life sentence.

These plaintiffs allege that the PAL was disbanded because of the race of those who controlled it. In pretrial proceedings Chief Magistrate Judge Sensenich characterized this as a § 1985(3) cause of action. We have also considered the case in that light.

The plaintiffs also alleged that, when the PAL was disbanded, they were deprived of their property without due process of law. PAL ran a concession stand at the prison where the members sold popcorn and soda pop. They alleged that the SCIP officials confiscated concession equipment, cameras, typewriters and other furniture which belonged to the PAL. Adopting Chief Magistrate Judge Sensenich's Report and Recommendation we dismissed this count, holding that the prisoners had an adequate remedy for this alleged wrong under state law pursuant to Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

A third count was added through an amended complaint. In that count, plaintiff James Hudson, alleged that he was harassed by the defendants for filing this law suit. According to Mr. Hudson, this amounts to interfering with his right of access to the courts and thus created a § 1983 cause of action. This count will also be decided in this opinion.

### Findings of Fact

First, we should point out that during the trial, it became apparent that the members of the PAL could not, themselves, agree on the validity of certain elections which had taken place, or which members should serve on the PAL board. We will not make any findings of fact on the validity of the elections because neither the elections nor the composition of the PAL board are relevant to the ultimate issues in this case. The only relevant facts are those involving the SCIP administration's view of these elections and its reasons for disbanding the PAL.

We would also note that the testimony in this case was rife with inconsistencies. Not only did the different witnesses on both sides contradict each other, but several individuals' testimony was internally inconsistent. Since it has been over eight years since these events occurred, memories have faded. As a result, deciphering the testimony in search of the truth has been difficult. But after much consideration we have settled on the following factual findings.

Sometime in late 1982, a group of inmates serving life sentences at the SCIP began discussing ways to change the PAL to better serve the needs of the membership. This group included Russell Shoates and plaintiff James Hudson, among others. At that time the PAL president was a life

sentenced prisoner, Ron Grim. The major activity of the PAL was running the soda pop and popcorn concession in the prison. The money earned was spent on a yearly banquet sponsored by PAL and other projects to better the institution, such as purchasing new carpet for the visitor's room at the prison. The plaintiffs and Russell Shoates felt that the PAL should do more to promote the concerns of life sentenced inmates; this group attempted to attend PAL meetings and discuss their concerns with the then board of directors and officers.

The plaintiffs offered evidence that, prior to their involvement with PAL, the average PAL membership meeting only attracted about twelve people including the board. The plaintiffs also presented testimony that notices of the meetings were not posted and that they were often turned away from meetings. After a few discussions with the PAL board, a "legal committee" was formed, including Russell Shoates and James Hudson.

This legal committee began meeting on Monday nights in the prison dining hall. There was controversy over whether these meetings were authorized by the administration. Russell Shoates testified that he discussed meetings with Leo Nobile, the activities director of the prison, who he believes approved the meetings. Mr. Wigton, the Deputy Director of Treatment testified that Mr. Nobile did not have the authority to approve these meetings. Regardless of whether or not the meetings were approved, the members of the legal committee were given access to the locked dining hall and held meetings once or twice a week with one meeting usually falling on Monday night.

These meetings soon grew to be more like general membership meetings. Mr. Shoates testified that when the topics covered by these meetings began to expand beyond simply legal committee problems, he went to Ron Grim, the then president, to discuss the possibility of holding expanded meetings under the auspices of the legal committee. The evidence offered at trial did not conclusively prove that Mr. Grim knew of these expanded meetings let alone approve them. Regardless of whether the PAL board knew of the meetings, or approved them, they were held. Attendance escalated dramatically. Sometimes over 100 life sentenced prisoners attended the meetings hosted by the legal committee.

The plaintiffs maintain that they discussed many topics important to life sentenced prisoners at these meetings. Most importantly they discussed using PAL money to purchase commutation papers for lifers, lobbying the Pennsylvania legislature to change the laws on life sentences and generally providing legal assistance to life sentenced prisoners. Thus, this new group of prisoners wanted to fundamentally change the activities and goals of PAL.

Beginning in March, 1983 the administration and staff of the SCIP received reports of changes within the PAL. Lt. George Yurich testified that over three or four days several inmates told the prison staff that PAL was holding unauthorized meetings, that this new inmate faction was going to "impeach" the old board and then hold elections and that these inmates were intimidating and threatening other inmates to gain control of the PAL. Specifically, Lt. Yurich felt that this new faction wanted to use PAL as a power base to put pressure on the institution. Yurich then completed an incident report and forwarded it to Lt. Richard C. Smith for further investigation.

The investigation began by the prison administration sending correctional officers to these legal committee meetings. Lt. Richard C. Smith, the Alternate Security Lieutenant at SCIP in 1983, testified that he assigned Officers Thomas Bodner and Charles Emmerick to attend two separate PAL legal committee meetings. Officer Bodner attended a meeting on March 16, 1983. Russell Shoates spoke at this meeting about wanting to change PAL. Mr. Shoates advocated that PAL adopt a new constitution, one that PAL members could accept and the administration would have to follow.

Officer Emmerick reported that on March 21, 1983 he went to a meeting where

Ron Grim was "impeached," and Russell Shoates, Edward Boyd, James Turner and James Hudson were temporarily elected to the board by a show of hands until a formal election could be held. Officer Emmerick further reported that Shoates addressed that meeting. Apparently, Mr. Shoates told the PAL membership that it was time that they used PAL to get things from the administration that the administration would not otherwise willingly give PAL members. Mr. Shoates also suggested that they would have to take what they wanted by other means if they were unsuccessful in dealing with the administration.

In the course of his investigation, Lt. Smith received information from two inmates, whom he treated as confidential sources. The lieutenant also spoke with Mr. Nobile the activities director and reviewed the PAL constitution. Lt. Smith also testified that he stopped in at one of the Monday legal committee meetings. The dining hall was reserved on Monday nights for the Alcoholics Anonymous ("AA") meeting. Lt. Smith testified that when he visited the dining hall, the PAL legal committee meeting was on one side of the dining hall and AA on the other.

At the close of his investigation, Lt. Smith had several concerns. First and foremost, he was afraid that the inmates might try to use PAL to plan an incident, i.e. a work stoppage or strike. In 1983 the SCIP was overcrowded and there was much tension in the institution. Lt. Smith believed that the activities of PAL only seemed to be exascerbating the situation. Therefore, he issued misconduct citations against the newly elected PAL board for conducting unauthorized meetings, i.e. the legal committee meetings. Plaintiff James Hudson received one of these misconducts, was convicted of the offense and as punishment he received "time served."[1]

A few days before the PAL election, all of the individuals running for election with Russell Shoates, including plaintiff James Hudson, were removed from their cells and taken to the Restrictive Housing Unit (R.H.U.). They remained segregated from the general population on the day of the election. However, Mr. Shoates and his ticket were elected to the PAL board. Mr. Shoates was never released from the R.H.U. but Mr. Hudson was not even charged or given a misconduct.

At the time PAL was disbanded in 1983, the administrators of the prison officially recognized that Russell Shoates had been elected president of the PAL. However, Mr. Shoates was unable to serve in that position, and Mr. James Hudson was elected to replace him by a standing vote taken at a general membership meeting. James Wigton testified that the administration recognized Mr. Hudson as the president of the organization. Defendant George Petsock, then the superintendent of the SCIP, met with Mr. Hudson shortly after he was elected president of PAL. Mr. Hudson maintains that defendant Petsock explained that if Mr. Hudson "played ball" with the administration, he would receive good treatment. Neither Petsock nor Mr. Wigton, who also attended the meeting, remember any such conversation. Both prison officials maintain that they met with Mr. Hudson to emphasize that PAL must obey the rules and regulations of the prison, that the meeting was cordial and that Mr. Hudson seemed cooperative.

However, later it came to Superintendent Petsock's attention that in 1983 the PAL board, without permission, had sent letters to various politicians and other individuals, requesting their attendance at the yearly PAL banquet which was to include a symposium. The prison administration considered these letters and others to be violations of prison regulations since PAL had not cleared this with the prison authorities. The regulations required the inmates to have their banquet and invitees approved before they could send out invitations. The plaintiffs do not dispute that they needed permission to send invitations, but they did not consider these letters to be invitations.

---

1. His official sentence on the misconduct report was "time served." I assume this means he was kept in "the hole" while awaiting the outcome of his hearing and that he received no additional time in "the hole" as punishment following the hearing.

The PAL witnesses stated that these letters were sent to get a rough estimate of how many people could attend before they submitted their banquet proposal to the administration.

Regardless of the purpose of the letters, their content and the changes in PAL leadership gave the administration cause for concern. As a result, James Hudson received a memorandum from Superintendent Petsock suggesting that he meet with Mr. Nobile to discuss getting approval for this banquet. Defendant's Exh. 5. Two weeks later Mr. Wigton sent a memorandum to some of the prison staff stating that a meeting had been arranged for Superintendent Petsock to meet with James Hudson and the newly elected PAL board. There is some dispute over whether Mr. Petsock or Mr. Hudson requested the meeting. However, who called for the meeting is not relevant to the case at hand.

Four passes were issued for PAL board members to attend this meeting. However, only two board members came along with two other inmates who wished to attend the meeting but who were not board members but "advisors" to the president, James Hudson. One of these advisors, Harold X (Smith), was not serving a life sentence and has since been released. Superintendent Petsock refused to meet with these individuals, and the meeting never occurred. That same day, June 28, 1983, PAL was disbanded by the SCIP officials.

Soon, after PAL was disbanded Mr. Hudson, president of PAL, Mr. Baynes, treasurer of PAL and Harold X (Smith) administrative assistant to Mr. Hudson filed this action. As previously noted, Mr. Hudson amended the complaint to include a Section 1983 cause of action alleging that he was being harassed for filing this suit. Mr. Hudson alleges that the defendants frequently searched him and his cell, and that he was given at least two unjustified misconduct reports. The only testimony offered to support the allegations of frequent searches was that given by inmate Sylvester Porter. We find Mr. Porter's testimony to be less than completely credible. Mr. Porter responded to Mr. Hudson's questions about how often he saw Mr. Hudson or his cell searched only after significant prompting by Mr. Hudson. During cross-examination it came to light that Mr. Hudson was acting as Mr. Porter's "jailhouse lawyer" in another case and possibly that Mr. Porter owed Mr. Hudson a favor. We suspect that Mr. Porter's testimony was less than completely truthful.

The defendants admit that Mr. Hudson and his cell were searched and that they issued misconduct citations against him. However, the defendants also presented credible evidence that these actions were taken for valid reasons. We find the defendants' evidence concerning these matters more credible than Mr. Hudson's allegations.

*The Law*

There are two civil rights statutes involved in this case, 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3). Section 1985(3) protects individuals from conspiracies to deprive them of equal protection of the law and equal privileges and immunities under the law. Here, the plaintiffs allege that the defendants conspired to deprive them of their First Amendment right to freedom of association by disbanding the PAL. In order to prove such a violation, the plaintiffs must establish the following five elements of a § 1985(3) cause of action:

1) A conspiracy;

2) motivated by racial or perhaps otherwise class-based invidious discriminatory animus;

3) for the purpose of depriving either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws;

4) an act in furtherance of the conspiracy; and

5) that the plaintiff was injured in his person or property or was deprived of having and exercising any right or privilege of a citizen of the United States. *Griffin v. Breckenridge,* 403 U.S. 88, 102–103, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971).

■ We hold that the plaintiffs have not satisfied all of these elements and cannot succeed on this claim. The most important element in this cause of action is the allegation of racially motivated invidious discriminatory animus, and the plaintiffs offered very little evidence to support this claim. Their main assertion is that their board members were black; they were disbanded, therefore they were disbanded because of their race. However, the only evidence offered by the plaintiffs that related directly to racism at the SCIP was the testimony of Robert Anderson. Mr. Anderson, formerly an inmate at the SCIP, testified that he sensed racism at the SCIP and that the staff contributed to that atmosphere. However, even Mr. Anderson admitted that he could not prove that such racism was fostered by the staff. In addition, the plaintiffs offered no evidence, either direct or inferential, that any of the named defendants made any racist statements to them or anyone else. Nor did the plaintiffs offer any proof that any actions taken by any of the defendants were motivated by racism.

However, the most striking evidence relative to this claim is that both the first and second PAL boards were racially mixed. Ron Grim's board consisted of three blacks and three whites, and the plaintiffs' board had one white member, Eddie Turner. The racial mix on both these boards belies the claim that the PAL was disbanded because of the race of the board members.

The plaintiffs attempt to rebut this fact by arguing that the blacks on the previous PAL board thought more like a whites than blacks, and therefore the administration did not object to them. Specifically, Mr. Hudson made the following statements in response to questions from this Court.

THE WITNESS [Mr. Hudson]: Your Honor, if you look at the individuals that was on his [Ron Grim's] board, you see some individuals. They might look like me, but they don't think like me. They think like, you know, like they try to be something other than themselves.

THE COURT: Are you saying these guys are Uncle Tom? Is that what you are saying?

THE WITNESS: I think you heard it for yourself yesterday Your Honor ...

THE COURT: But I mean, I don't think the Supreme Court expects the courts like this one to go into a black man's mind and decide, yes, he is more white than he is black?

THE WITNESS: Yes, Sir.

THE COURT: How can the courts do that?

THE WITNESS: You can't, Your Honor, not really ...

Tr. Thursday, June 13, 1991, pp. 3–4.

Thus, even one of the plaintiffs admitted that this argument could not be successful. Accordingly, we hold that the racial mix on both boards precludes the plaintiffs' claim that the demise of the PAL was the result of racially motivated invidious discriminatory animus.

■ In addition, if the plaintiffs intended to assert that the defendants deprived them of their right to freedom of association without due process of the law by disbanding the PAL, they cannot succeed. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court established that prison officials may suspend prisoners' civil rights without any due process if these actions are motivated by security concerns. Here, the defendants have clearly demonstrated, and we do find, that at the time PAL was disbanded, the defendants' actions were motivated by a sincere belief that the course the PAL had undertaken threatened the security of the institution. As a result, disbanding the PAL was not an unconstitutional deprivation of the plaintiffs' right to freedom of association.

We now turn to Mr. Hudson's harassment allegations. We characterized this § 1983 claim as alleging a violation of plaintiff James Hudson's Fourteenth Amendment due process rights. Specifically, Mr. Hudson charged that the misconduct citations he received were given without due process as part of a deliberate scheme of harassment by prison authorities because he filed this lawsuit. In his amended complaint, Mr. Hudson listed several instances of this alleged harassment.

However, Mr. Hudson did not offer evidence to support all of these allegations at trial. Therefore, we will only discuss the allegations for which he offered evidence at trial. All the other allegations raised in the amended complaint, but not supported by evidence at trial, are to be considered decided in the defendants' favor.

 The plaintiffs must rely on the case law which states that an inmate must not be punished or threatened for using his right to access the courts. *See, Hudspeth v. Figgins,* 584 F.2d 1345 (4th Cir.1978). Mr. Hudson testified that, on July 2nd and 3rd, 1988, he was subject to two strip searches coupled with several cell searches. No written record of these searches was offered as evidence by either the defendants or the plaintiffs. Thus, the only corroborating evidence of these events is the testimony of Sylvester Porter. While, we do not doubt Mr. Hudson's testimony that these events occurred, we cannot conclude that these searches were part of systematic harassment for filing this action. Mr. Hudson offered no evidence aside from his opinion that these searches were harassment because of the suit. As a matter of fact, Mr. Hudson admitted that prison officials informed him that these searches occurred because he had a history of having contraband.

In response, Mr. Hudson argued that he had never been found with drugs or alcohol. However, his prison record shows that Mr. Hudson had been found with flammable aerosol, unauthorized cash and excess commissary items all of which are considered to be contraband in this prison. On this basis we find that the prison officials had ample reason to suspect Mr. Hudson of possessing contraband. Thus, we hold that these searches were conducted for a valid penological reason and were not part of a systematic pattern of harassment for his filing this action.

 Mr. Hudson also testified that he was placed in the R.H.U. in July, 1986 after a correctional officer stated that he had found a knife above the door of Mr. Hudson's cell. These charges were later dismissed, but only after Mr. Hudson spent 10 days in the R.H.U. Mr. Hudson maintains that the defendants did not lock his cell and that all his possessions were stolen during the time he was in the R.H.U. Again, neither party submitted any evidence on the record that this occurred aside from Mr. Hudson's testimony, nor did Mr. Hudson submit any evidence aside from his own testimony that these charges were in retaliation for filing this law suit.

Another incident about which Mr. Hudson testified occurred in January, 1984. This incident has several components, the first being a strip search of Mr. Hudson and then his being placed in a cell without water and with the door blocked. Mr. Hudson maintains that this constituted harassment because the officers accused him of hiding something in his anus.

According to Lt. Smith, however, such a strip search is standard procedure when an inmate housed in the A–Range, leaves that range; upon his return, the inmate is subject to a strip search. On this occasion, the officers conducting the search, including Lt. Smith, believed Mr. Hudson was hiding a piece of white plastic in his anus. As a result, the plaintiff was taken to a special cell where the water in the plumbing was turned off and the door was completely blocked. In some rather distasteful testimony it was revealed that on the way to the cell, Mr. Hudson had defecated in his pants making it quite possible that the foreign object had fallen out along the way.

Lt. Smith testified that turning off the plumbing and blocking the door was standard procedure to prevent an article hidden in a body cavity from being flushed down the toilet or being passed to another inmate through the opening in the cell door. Mr. Hudson maintains that this constitued harassment.

In addition, Mr. Hudson maintains that when he moved from his cell to the A-range he was forced to carry heavy boxes down the stairs. Mr. Hudson feels that this was also harassment because he was a heart patient and could not handle the physical strain. As a result he suffered chest pains and was taken to the hospital. Lt. Walsh

**1038**

testified that it was standard procedure for an inmate to carry his personal property to the storage area when he was removed from his cell. However, Lt. Walsh also stated that if the correctional officers knew the inmate had a health problem that prevented such activities other arrangements could be made. Mr. Hudson produced no testimony to establish that the guards knew of his heart problem.

Mr. Hudson also stated that while in the cell without water he had a relapse of chest pains and had to be taken to the hospital again. In the hospital, Mr. Hudson's ankle and wrists were cuffed to his hospital bed. Mr. Hudson believes that this restraint was also harassment by the defendants. The defendants disclaim any knowledge of this restraint.

As discussed above, the defendants presented ample proof that the discipline leveled against Mr. Hudson was not in retaliation for this law suit but because of violations of prison regulations. Mr. Hudson's misconduct record supports the claim that he had a history of possessing contraband in the prison. Also, various corrections officials at the prison testified that the other incidents of which Mr. Hudson complains were actually standard procedure in those situations. This suggests to this Court that Mr. Hudson was not singled out or subjected to outrageous treatment simply because he filed this action. Rather, the security concerns in prison dictate such extreme procedures in certain limited circumstances.

In addition, we cannot conceive of how three incidents over the span of eight years, separated by two years each, amounts to systematic harassment. Thus, we find that Mr. Hudson cannot succeed on his § 1983 action claiming that he was threatened or punished for his use of the courts. Nor do we find that the plaintiffs can succeed on their § 1985(3) claim.

As previously noted, the plaintiffs have attempted to jump the line from their right to humane treatment to an assertion that they are entitled to almost all of the rights, privileges, and immunities of an ordinary citizen. This is simply not the case. Plaintiffs argue that they are entitled to freedom of association; we hold that they are not if the security and well-being of the institution is in jeopardy. The prison authorities had the authority to disband the PAL. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

Plaintiff Hudson asserts that he was harassed. We find that the acts of which he complains did not amount to harassment but rather were well within the bounds of necessary discipline and security precautions considering his own past record in the institution and the factual scenario of this case.

■ As a postscript, we would add that after the close of the trial we received two additional amended complaints filed by the plaintiff, James Hudson. Mr. Hudson alleges further harassment as a result of his testimony at trial. We cannot accept or consider an amended complaint after the close of a trial.