■ In the Matter of DOREEN MENDEZ et al., Respondents, v DAVID N. DINKINS, as Mayor of City of New York, et al., Appellants, et al., Respondents. [640 NYS2d 889] —Order and judgment (one paper), Supreme Court, New York County (Joan B. Lobis, J.), entered January 18, 1994, which granted the petition in this CPLR article 78 proceeding to the extent of nullifying an order of the New York City Department of Housing Preservation and Development (HPD) for tenants to vacate a multiple dwelling at 222 East 13th Street in Manhattan in order to facilitate repairs, unanimously reversed, on the law and the facts, the petition is denied, the vacate order reinstated and confirmed, and the proceeding dismissed, without costs.

The Housing Maintenance Code (Administrative Code of City of NY, tit 27, ch 2) grants HPD the authority to order a dwelling vacated where it is "unfit for human habitation" (§ 27-2139 [b]), a condition defined as constituting "a danger to the life, health, or safety of its occupants" (§ 27-2139 [a]). Such an order

must be served on at least 24 hours notice (§ 27-2140 [b]).[1] According to the IAS Court, the purpose of such notice is to afford protection for a tenant from summary eviction.

Constructed more than 125 years ago, the building in question contains 26 single-room-occupancy units with a common bathroom on each floor, and one Class A apartment. It is made of non-fireproof materials, and at the time of the vacate order, only six of the units (three of which were occupied) had direct access to the solitary fire escape. The sprinkler system did not conform to safety regulations (sprinkler heads were located only in public hallways, four heads were missing, and others were more than 14 feet apart), there was a combustible oil tank stored in the cellar, electrical wiring was exposed, and debris was scattered throughout the building. An inadequately vented gas combustion heat/hot water boiler in the cellar allowed smoke and flue gases (including carbon monoxide) to escape inside this and an adjoining building. Tenants were illegally cooking in their rooms on small electric stoves or hot plates, and fires had been reported in the building. In addition to the numerous violations, there was a lack of security, and the building had gained notoriety in the local press as a haven for drug traffickers and prostitutes.

In February 1991, in response to an RPAPL article 7A proceeding brought by HPD, an administrator was appointed for the building, with authority to borrow money and make repairs in order to reduce the outstanding violations. At about the same time, in the aftermath of the Happy Land Social Club fire which had killed 87 people in a building with an inadequate sprinkler system, HPD, under authority of section 27-2090 of the Administrative Code, issued Procedure 1-1991. This directive set forth comprehensive criteria and detailed procedures for the issuance of a vacate order where inspection revealed "conditions that are so potentially injurious to health and safety as to make imperative the immediate evacuation and relocation of the occupants."

Within days of the September 1992 news exposé of the

---

1. *Cf.*, Administrative Code § 15-227 (b), wherein the Fire Department is given authority to order the immediate vacating of a building whose conditions are "imminently perilous to life or property". Similarly, the Commissioner of the Department of Buildings may order a building sealed where its conditions or effects are "dangerous or detrimental to life or health" (§ 26-127). However, neither these nor any other provisions preclude other interested agencies, such as HPD, from acting appropriately where emergency relief is warranted (*Various Tenants v 515 E. 12th St.*, 128 Misc 2d 235, 237-238; *Matter of Department of Hous. Preservation & Dev. v Cohen*, 128 Misc 2d 351, 352).

conditions at hand, inspectors from the Department of Buildings, the Fire Department and HPD descended on the building and issued numerous code violation notices (some of which were duplicative of earlier notices) and orders to repair. More than 100 of these new violations were classified as "hazardous" or "immediately hazardous". HPD's Manhattan Borough Chief Inspector personally inspected the building on September 24, 1992, and recommended a vacate order, which was concurred in the following morning by the City-wide Chief Inspector, the Assistant Commissioner of the Division of Code Enforcement and the Deputy Commissioner for Rent and Housing Maintenance. The order cited 264 pending violations on the premises, including broken, missing and dismantled sprinkler sections and locked primary egress; inadequate sanitary facilities throughout; missing vent allowing dangerous fumes to enter the building from the boiler in the cellar; extensive overcrowding; illegal cooking, creating a fire hazard; broken, missing or dismantled plumbing vents and waste lines throughout; exposed electrical wiring and defective fire retardant in common areas; missing fire retardant ceiling and storage of combustibles in the cellar; and broken, defective or rotted floor joists throughout. The notice was posted on the morning of September 25, tenants were given plastic bags for packing their belongings immediately, and were relocated temporarily to the Riverview Hotel at government expense. All remaining possessions were placed in storage.

This proceeding sought an injunction against the already executed order to vacate, arguing insufficient notice, *inter alia*. The municipal respondents averred that the order was warranted by emergency conditions, based not just on community concerns but on independent assessments.

At a 7-day hearing held in October 1992, the IAS Court heard expert testimony as to the post-vacate inspections which confirmed the numerous health and safety hazards in the building. Most urgent seemed to be that the main staircase, which was the only means of egress for the vast majority of residents, was an unenclosed, wooden combustible staircase extending from the first to the third floors, unprotected by a legally adequate sprinkler system. Fumes and smoke from the boiler room were not properly vented because its chimney had been built for a fireplace, not a boiler. Replacement of the chimney would take $1^1/_2$ months, during which period the entire building would be without heat or hot water.

In annulling the vacate order for failure to give "due process" by means of a proper 24-hour notice, the IAS Court made

erroneous findings of fact. Concerning the fire hazard at the primary means of egress, the court found (1) that there were, nonetheless, sprinklers in the common hallway, (2) that a Department of Buildings inspector had found the building to be structurally sound and "fully sprinklered" as of two days before the vacate order, and (3) that "the building seems to have existed for many years without sprinklers under the stairway soffits, the lack of which is only a 'b' violation." No mention was made of the noxious fumes and gases emanating from the boiler room to parts of this and the adjoining building. Indeed, the court rejected out of hand the notion that the overwhelming volume of violations were for conditions hazardous to health and safety, warranting an immediate evacuation. The court seemed more concerned that the vacate order was an arbitrary and capricious response to the notoriety the building had received as a "crackhouse", perceiving the appropriate remedy to be simply the removal of the offenders.

In addition to the "correctable" conditions of faulty electrical wiring, combustibles stored in the cellar, obstructions around the building entrance, overcrowding, illegal cooking and lack of security, the record clearly establishes this building as posing an immediate hazard to life and health by fire[2] and the circulation of poisonous gases. In view of the life-threatening gravity of these conditions, the court's preoccupation with notice to the tenants was inappropriately excessive. The fact that such conditions had existed already for some time did nothing to reduce the urgency of the situation presented. Past neglect is not to be ameliorated by current indifference.

As an emergency measure, HPD Procedure 1-1991 was not restricted by the procedural notice contents of Administrative Code § 27-2140 (b). The imposition of such a restriction on emergency powers designed to protect the health and safety of citizens is an improper judicial intrusion upon executive and administrative discretion (see, Matter of Gerges v Koch, 62 NY2d 84). It is important to note that these residents were not

---

2. The law requires a dwelling of this size to have "either two independent means of egress or one means of egress equipped with a sprinkler system" (Multiple Dwelling Law § 187 [1] [b]). The regulations of the Department of Buildings further require sprinklers to be "arranged to spray all parts of the public stairways, service stairways, their hallways, landings and soffits" of a multiple dwelling, and that they should be "installed under the soffit of each public stairs spaced not more than fourteen (14) feet apart." (1 RCNY 29-06 [g].) This building met neither of those requirements.

being put out on the street. In virtually every case, the resident was relocated to "far superior" accommodations.[3]

The exercise of emergency authority in this instance was a purely discretionary act, and "it is not a requirement of due process that there be judicial inquiry before [this type of] discretion can be exercised" (*Ewing v Mytinger & Casselberry*, 339 US 594, 599; *see, Matter of Salgado v Walsh*, 69 Misc 2d 789). Indeed, the government has a paramount interest in protecting the public from imminent danger. Summary administrative action, even which results in deprivation of a significant property interest without a prior hearing, is justified when it responds to a situation in which swift governmental action is necessary to protect the public health and safety (*Hodel v Virginia Surface Min. & Reclamation Assn.*, 452 US 264, 299-301). Under these circumstances, due process was satisfied by the post-evacuation hearing (*Parratt v Taylor*, 451 US 527, 541), at which point it was still respondents' intention to return petitioners to their vacated apartments upon completion of the necessary repair work. Concur—Murphy, P. J., Wallach, Ross, Nardelli and Tom, JJ.

---

3. A subsequent million-dollar claim on behalf of each of the petitioners herein, alleging "property damage, infliction of emotional distress, [and] violation of their civil rights," *inter alia*, filed within days of the IAS Court decision, was never pursued beyond the notice stage. Indeed, the few complaints lodged by petitioners at the judicial hearing were proven unfounded or exaggerated.